PEOPLE v LOVETT

1. WITNESSES—CRIMINAL LAW—UNINDORSED WITNESSES—INDORSED
WITNESSES—APPEAL AND ERROR—NEW TRIAL—PROSECUTOR'S
DUTIES.

A criminal defendant desiring reversal of a conviction or a new
trial because of a failure to produce an unindorsed or an
indorsed witness shall, before filing his brief on appeal, move
the trial court for a new trial; at the hearing on the motion the
prosecutor shall produce or explain why he cannot produce the
witness or, as the case may be, why he did not indorse and
produce him at the trial; if the witness is produced at the
hearing he shall be examined regarding his knowledge of the
crime; if a new trial be denied the judge shall state his reasons.

2. WITNESSES—CRIMINAL LAW—RES GESTAE WITNESSES—INDORSED
WITNESSES—MISTRIAL—EVIDENCE—INSTRUCTIONS TO JURY.

There were no grounds for a mistrial where the prosecution
failed to produce two indorsed res gestae witnesses at trial, but
where the testimony which they would have given was com-
pletely presented to the jury in a light favorable to the defend-
ant and the court instructed the jury that they could infer that
the testimony of the missing witnesses would have been unfa-
vorable to the prosecution.

3. CRIMINAL LAW—JURY DELIBERATIONS—INSTRUCTIONS TO JURY—
DUTY OF COURT—COURTS.

A court in a criminal case has a duty, absent some expression
from the jury of an absolute impossibility of further delibera-
tion, to respond to the jury's message that it is "hung" by
advising them of the practical necessity and prudence of fur-
ther deliberation.

4. CRIMINAL LAW—INSTRUCTIONS TO JURY—LESSER INCLUDED OF-
FENSES.

A criminal court is not obligated to instruct on a lesser included

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 75 Am Jur 2d, Trial § 771.
[3] 21 Am Jur 2d, Criminal Law §§ 204, 207.
[4] 21 Am Jur 2d, Criminal Law §§ 185, 494.

offense unless the jurors can reasonably infer from the evidence, or lack of evidence, that the greater offense was not committed and that the lesser offense was committed.

Appeal from Recorder's Court of Detroit, Susan D. Borman, J. Submitted May 8, 1975, at Detroit. (Docket No. 20451.) Decided August 26, 1975. Leave to appeal applied for.

Rufus Lovett was convicted of larceny from the person. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Patricia J. Boyle,* Principal Attorney, Research, Training and Appeals, and *Raymond P. Walsh,* Assistant Prosecuting Attorney, for the people.

*M. Arthur Arduin (Carl Ziemba,* of counsel on appeal), for defendant.

Before: V. J. BRENNAN, P. J., and McGREGOR and D. F. WALSH, JJ.

McGREGOR, J. Defendant was charged with armed robbery, MCLA 750.529; MSA 28.797. The jury found defendant guilty of the lesser included offense of larceny from the person, MCLA 750.357; MSA 28.589. He was sentenced to a term of from 4 to 10 years in prison, and appeals as of right.

The complaining witness, Benjamin Wilson, testified that after leaving a bar in Detroit with two ladies, Raynetta Booker and Gail Sturdivant, he was asked by three strangers for a ride to Woodward Avenue. When he approached Woodward, one of the hitchhikers in the back seat said, "All right, get out of the car". Wilson testified that he opened the door and stepped out, after noticing

that one of the hitchhikers had a gun. After stepping outside of his car, his wallet, which contained $5, was taken from him by the robbers.

After being parted from his wallet, Wilson was told to walk away, and at this point a police car came around the corner. Wilson was able to stop the police car and inform the officers that he had just been robbed and that the thieves were driving away in his car. When the robbers disregarded the police order to halt, the officer fired a shot at the car.

Wilson later recovered his wallet from the police property room, two days after the robbery; he also recovered his car, which was damaged extensively and had a bullet hole in it. At trial, Wilson could not make an in-court identification of the culprits. He testified that, while he did not see the two ladies get out of the car, he saw them outside of the car when it was being driven away by the robbers.

Five Detroit police officers testified at trial. Two of them testified that they were flagged down by Mr. Wilson, who informed them that he had been robbed and that the culprits were driving down the street in his car; that they attempted to stop the car and were forced to fire a shot when the driver of the car refused to stop. The officers stated that they were joined in the chase of the stolen car by other police vehicles and that the defendants were apprehended when the stolen car crashed into the rear of an automobile stopped at a red light.

Two other officers testified that they joined in the pursuit of the stolen vehicle and, after the accident, arrested the occupants of the car, one of whom they identified as this defendant. The officers also found on the defendant's person a black

wallet with identification papers bearing the name of Mr. Wilson. This wallet was identified as the one taken from Mr. Wilson.

Another officer testified that he arrested the brother of the defendant that night in the area of the robbery, after hearing a description on the air and seeing the defendant's brother, who fit the description. A search of the arrestee produced a .45 automatic Colt pistol.

Defendant testified in his own behalf and admitted on the record his many convictions. His version of the incident was that he met his brother on the night of the robbery and knew that his brother was armed. He admitted that he and his brother asked the complainant for a ride and got into the back seat of the automobile.

At this point, the defendant stated that, although his brother told everyone to get out of the car and emphasized this request at gunpoint, there was no robbery. When the police pulled up, the defendant testified, he jumped into Wilson's car and sped away because he had a record and did not want to go back to jail. The defendant concluded that, since he did not take Mr. Wilson's wallet, he must have been "framed" with the evidence.

The court instructed the jury that they could consider verdicts of guilty of robbery armed, of robbery unarmed, of larceny from the person, and not guilty. The defendant had requested an instruction upon attempted robbery armed, which was denied.

The defendant raises three issues on appeal. First, the defendant claims that the trial court erred in denying his motion for a mistrial, based upon the prosecution's nonproduction of two endorsed res gestae witnesses.

The two res gestae witnesses, who were endorsed but not produced at trial, were Raynetta Booker and Gail Sturdivant. After the prosecution rested, defense counsel moved for a mistrial because of the nonproduction of these two endorsed res gestae witnesses. The trial judge denied this motion, stating that such nonproduction entitled the defendant only to an instruction that the jury could infer that, had the witnesses been produced, their testimony would be unfavorable to the prosecution.

In *People v Coppernol,* 59 Mich App 745; 229 NW2d 913 (1975), this Court stated that prior to *People v Robinson,* 390 Mich 629; 213 NW2d 106 (1973), when the identity of the res gestae witness is made known to the defendant prior to trial, or even before, and defendant does not move for the endorsement or production of the witness, the failure of the prosecution to endorse or produce is not grounds for reversal. The Supreme Court, in *Robinson,* modified this rule by requiring a remand to the trial court for an evidentiary hearing, in order to prevent a useless new trial and to avoid a possible miscarriage of justice.

However, the appeal in the case at bar was filed after the publication of the *Robinson* opinion. In *Robinson,* at page 634, the Court specifically stated:

"In appeals filed after this opinion is published, a defendant desiring reversal or a new trial because of a failure to produce an unindorsed or an indorsed witness shall, before filing his brief on appeal, move the trial court for a new trial. The prosecutor shall produce or explain why he cannot produce the witness or, as the case may be, why he did not indorse and produce him at the trial. If the witness is produced at the hearing, he shall be examined regarding his knowledge of the crime. If a new trial be denied, the judge shall state his reasons."

The question now becomes whether there was compliance with the dictates of *People v Robinson, supra.* While the defendant did not move for a new trial, he did move for a mistrial. Although a motion for a mistrial and a motion for a new trial are not the same, we believe that such a motion in this case was sufficient to comply with the dictates of *Robinson.* The test on review of a trial court's denial of a motion for a mistrial and a motion for a new trial is whether the trial court abused his discretion. Likewise, in both instances, the Court is guided by the same consideration, whether justice has been done.

Also, the trial judge, in effect, held an evidentiary hearing as required by *Robinson.* Prior to the court's ruling on the motion, evidence was introduced by the prosecution to explain the nonproduction of the witnesses. Mrs. Putman, Gail Sturdivant's mother, testified that her daughter lived at home and that she gave her daughter the subpoena which was left by the police. Mrs. Putman also testified that her daughter, who was pregnant, had been hit on the head and went to the hospital for stitches. Mrs. Putman stated that two of the three men involved in the case at bar were free, and that her daughter had been hit in the head and was frightened and did not know what to do. In conclusion, Mrs. Putman stated that her daughter had been injured, then subpoenaed, and had fled the people's attempt to secure her testimony.

Evidence was also introduced that the other missing witness had given the police an incorrect address. The police went to the vicinity of the address and found that it was nonexistent.

Further, the defense counsel, during cross-examination of the investigating officer at the scene of

the crime, brought out the res gestae statements of the two missing witnesses. The officer testified that the witnesses told him: (1) all three of the men in the car "held up" the complainant; (2) the individual in the middle held the automatic weapon; (3) after being ordered out of the car, both ladies were told to remove their clothing; (4) after they got out of the automobile, the defendant was also ordered out.[1]

A review of Mr. Wilson's testimony reveals the following: (1) Wilson picked up three men who asked to be driven to Woodward Avenue. (2) Before reaching Woodward he was told to "hold it". and "they" forced him to stop and exit the automobile. (3) Wilson was then searched by one of the three men. (4) The individual sitting between the other two men in the car carried the gun. (5) His wallet was taken.

The testimony of the defendant himself corroborates all but one of the complaining witness's statements, namely, that the wallet was taken from Mr. Wilson.

Upon examining this testimony, we must now answer the question of whether the trial court was correct in denying the motion for mistrial, based upon its conclusion that an instruction to the jury that the missing witnesses' testimony would have been adverse to the prosecutor. We find no error in this case.

The only conceivable testimony which the witnesses might have offered favorable to the defendant would have been that they either did not see the wallet taken from Mr. Wilson, or that the wallet in fact was not taken. This was precisely the effect of the instruction given.

---

[1] In *People v Frank Johnson*, 58 Mich App 1; 226 NW2d 730 (1975), the Court held such res gestae statements admissible.

A similar problem was presented in *People v Gordon,* 60 Mich App 412, 417; 231 NW2d 409 (1975). There, as here, much of the witness's testimony would have been detrimental to the defendant. The witness's res gestae statements to the police characterized the defendants as hold-up men. We echo the Court's statement in *Gordon,* to the effect that:

"We do not hold that such an instruction is sufficient in all cases where a res gestae witness was not endorsed. If the witness's testimony gives complicated or detailed corroboration of the defendant's version of the facts or if the testimony contains complicated or detailed rebuttal of prosecution evidence, the only remedy may be a new trial. Since the present case involves considerably less forceful evidence which was completely presented to the jury in a light favorable to the defendant, the instruction was sufficient."

The defendant next contends that the trial court's supplementary instruction to the jury coerced the verdict of larceny from the person. We disagree.

The jury was given the case at 3:20 p.m. on February 26, 1974. At 5 p.m. of the same day, the court granted the jury's request to be read the entire testimony of one of the witnesses. The jury was excused that day at 6 p.m. until 9 a.m. the following morning. At 4:30 p.m. the following day, February 27, the jury asked for the reading of the same witness's testimony, which request the court also granted. At 5 p.m. on February 27, 1974, the court received a note from the jury that the jury was "hung". The court excused the jury until the following day at 9 a.m. At 2:30 p.m. the following day, February 28, 1974, the jury asked to be reinstructed on the possible verdicts they could re-

turn and the elements of the offenses involved. The court instructed the jury on the elements of the offenses involved and the possible verdicts, and concluded by saying:

"I was at this point going to call you all out to talk to you. And I would like to say that I know that there has been an awful lot of work put in this case both by the prosecution and by the defense. And I feel that you as jurors are just as capable of deciding this case as the next jury that might hear this case.

"So I'm asking you in all sincerity, I'm not trying to pressure you or coerce you in any way to please listen to each other, talk about it, and please try and come to a verdict. If you can't you can't. But please try."

At 4:45 p.m. on February 28, 1974, the jury was excused for the day, until 9 the following morning. At 3 p.m. on March 1, 1974, the jury returned its verdict.

We find *People v Hargrove,* 57 Mich App 378; 225 NW2d 772 (1975), dispositive of this issue. There, the Court stated, at page 382:

"The *Allen*-type charge *[Allen v United States,* 164 US 492; 17 S Ct 154; 41 L Ed 528 (1896)] given here has since been considered in *People v Sullivan,* 392 Mich 324; 220 NW2d 441 (1974). Though not found to be coercive per se, its potential as a coercive influence was recognized, and inquiry must be made as to whether it was in fact coercive in each particular case."

In this case, following an inquiry as to whether the instruction was in fact coercive, we reach the same conclusion as that reached in *Hargrove.* We think it was entirely proper under the circumstances above, for the court to point out to the jury the relatively short time they had deliberated considering the duration and importance of the

trial. Absent some expression from the jury of absolute impossibility of further deliberation, the court has a duty to respond to the jury's message by advising them of the practical necessity and prudence of further deliberation. The fact that the jury deliberated for the remainder of the day, following the court's instruction, and was then excused for the night, and returned a verdict at the end of the following day, after further deliberations, demonstrates that the effect of the instruction was not coercive.

Lastly, the defendant claims that the trial court erred in refusing to instruct the jury as to the lesser included offense of attempted robbery armed. We disagree.

A judge is not obligated to instruct on a lesser included offense, unless the jurors can reasonably infer from the evidence or lack of evidence, that the greater offense was not committed and that the lesser offense was committed. *People v Hodo,* 51 Mich App 628; 215 NW2d 733 (1974). There was no evidence of anything but a complete crime. We find no error.

Affirmed.