23 F.3d 406
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Dashea GREEN, Petitioner-Appellant,
v.
Pamela WITHROW, Warden, Michigan Reformatory, Respondent-Appellee.
 No. 93-1830.
 United States Court of Appeals, Sixth Circuit.
 April 28, 1994.
 
 Before: JONES, BOGGS, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Dashea Green was convicted in a Michigan state court of second-degree murder, armed robbery, assault with intent to murder, and possession of a firearm during the commission of a felony. After exhausting his state remedies, Green petitioned the district court for a writ of habeas corpus. The district court denied his petition and he now appeals the district court's order. Because we find that Green received a fundamentally fair trial, we affirm the district court's denial of Green's petition for a writ of habeas corpus.
 
 
 2
 * Green's convictions stem from a shooting in March 1987. Two brothers, James Bellinger Williams and Leon Higgins, were at a "party store" in Detroit. While Higgins played video games, Williams left the store to make a "drug collection" for "Eric," a known drug dealer in the area. After Williams finished his errand, he returned to the store and he and Higgins headed home.
 
 
 3
 As they were walking home, the brothers were approached by Green and Mark Hunter. According to Green, Hunter had phoned Green earlier and asked Green to accompany him to "do the rip they had talked about." As Williams and Higgins approached Hunter and Green on the street, Hunter and Green pulled guns and ordered Williams and Higgins to "give it up." Williams gave Hunter a wad of money and Hunter told Williams and Higgins to run.
 
 
 4
 At this point, Hunter and Green began shooting at Williams and Higgins. Williams was killed by a shot through the back and Higgins was wounded. When police officers arrived at the scene, Higgins told them that Green had shot him. When the police questioned Green a day later, Green admitted owning a gun. After Green was taken to police headquarters for questioning, he signed a written statement in which he admitted his role in the robbery. He maintained, however, that he shot Higgins only because he thought Higgins was reaching for a gun.
 
 
 5
 Green and Hunter were charged with first-degree premeditated or, in the alternative, second-degree murder (felony murder) of Williams, assault with intent to murder Higgins, armed robbery of both Williams and Higgins, and possession of a firearm during the commission of a felony. Green requested a jury instruction on self defense, mere presence, and the lesser included offense of felonious assault in conjunction with the assault with intent to murder charge. The court gave the jury instructions on aiding and abetting but did not give a "mere presence" instruction despite allegedly agreeing to do so. The court refused to give an instruction on the lesser included offense of felonious assault.
 
 
 6
 The jury began deliberations at 9:44 a.m. on September 16, 1987. At 11:05 a.m., the jury requested clarifying instructions on some issues and asked to see certain items not entered into evidence. At 11:55 a.m., the jury declared that it could not reach a unanimous decision on any of the six counts. The court read an instruction on deadlocked juries and chastised the jury for not putting enough time into the deliberations. The jury then continued deliberations.
 
 
 7
 At 3:45 p.m., the jury again indicated that it was deadlocked. The defense counsel requested the court to dismiss the jury and the court denied the request. Instead, the court excused the jury for the day. The jury resumed deliberations at 9:00 a.m. the next day and, at 11:15 a.m., again informed the court that it was deadlocked. The judge told the jury that it was not uncommon for juries to deliberate three or four days in trials like Green's and that she was not going to excuse them at the present time.
 
 
 8
 The court then read the instruction on deadlocked juries again, but, over defense counsel's objection, omitted the section that indicated that the verdict in a criminal trial must be unanimous. The court, however, reminded the jurors that, while they should deliberate with a view towards reaching a verdict, none of the jurors should surrender his or her views if doing so violated his or her own judgment.
 
 
 9
 The jury again retired for deliberations at 11:25 a.m. and deliberated until 3:50 p.m., apparently without a lunch break. At that time, the jury returned with a verdict finding Green guilty of second-degree murder, armed robbery, assault with intent to murder, and felony firearm.
 
 
 10
 After Green exhausted his state remedies, he filed this petition for writ of habeas corpus in the district court.
 
 II
 
 11
 In general, this court reviews de novo a district court's denial of a writ of habeas corpus. Carter v. Sowders, 5 F.3d 975, 978 (6th Cir.1993), petition for cert. filed, 62 U.S.L.W. 3659 (U.S. Mar. 16, 1994) (No. 93-1500). We affirm the district court's factual determinations, however, unless clearly erroneous. Ibid. We give complete deference to state court findings of fact that are supported by the evidence. Sumner v. Mata, 455 U.S. 591, 597, 102 S.Ct. 1303, 1307 (1982).
 
 
 12
 * Green's first argument is that the trial court's instructions on deadlocked juries were coercive and thus deprived him of a fair trial. Supplemental charges of this type have been expressly approved by the United States Supreme Court. See Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 157 (1896).[1]
 
 
 13
 When a petitioner for a writ of habeas corpus alleges that a court deviated from an approved Allen charge, a federal court must "weigh[ ] the prejudicial impact of a variation of the approved charge." United States v. Scott, 547 F.2d 334, 337 (6th Cir.1977). The inquiry is whether " 'in its context and under all the circumstances' the Allen charge was 'coercive.' " Williams v. Parke, 741 F.2d 847, 850 (6th Cir.1984) (quoting Jenkins v. United States, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060 (1965)), cert. denied, 470 U.S. 1029, 105 S.Ct. 1399 (1985). We have expressed concern over instructions that (1) single out the minority of jurors, Williams v. Parke, supra (instruction held valid on collateral review despite flaws); (2) fail to instruct the members of the jury that while they should listen to one another, each juror should vote his or her own conscience, United States v. LaRiche, 549 F.2d 1088 (6th Cir.) (instruction held valid on direct review because it reminded jurors to adhere to their conscience despite reference that case must be "disposed of" at some time), cert. denied, 430 U.S. 987, 97 S.Ct. 1687 and 434 U.S. 966, 98 S.Ct. 506 (1977); or (3) indicate that a hung jury is unacceptable by emphasizing extraneous factors such as the harried judge's trial schedule, United States v. Scott, supra, (instruction held invalid on direct review).
 
 
 14
 We also note that other circuits have examined closely the coercive impact of multiple Allen charges. See United States v. Reed, 686 F.2d 651 (8th Cir.1982) (giving two Allen charges is not per se coercive); United States v. Fossler, 597 F.2d 478 (5th Cir.1979) (impact of multiple Allen charge must be assessed in light the judge's language and facts and circumstances that form the context of the multiple charges); United States v. Robinson, 560 F.2d 507 (2d Cir.1977) (en banc), cert. denied, 435 U.S. 905, 98 S.Ct. 1451 (1978) (although chance of coercion increases with successive Allen charges, a second Allen charge is not coercive per se ); but see United States v. Seawell, 550 F.2d 1159 (9th Cir.1977) ("it is reversible error to repeat an Allen charge in a federal prosecution in this circuit after a jury has reported itself deadlocked and has not itself requested a repetition of the instruction").
 
 
 15
 In this case, the court's Allen instruction and conduct were less than ideal, but in the totality of the circumstances, the errors did not deprive Green of his constitutional rights. First, the trial judge's instruction did not single out a minority of jurors. After three hours of deliberating, the foreman indicated to the judge that the jury could not reach an agreement; the foreman did not inform the judge which way the jury was leaning or the numerical split. Thus, no juror hearing the Allen instruction would have thought that the judge was singling that juror out for disapproval.
 
 
 16
 Second, the judge's instruction made it clear that each juror should follow his or her own conscience rather than cave in to the will of the majority. The judge initially instructed the jury that
 
 
 17
 "[i]t is your duty to consult with your fellow jurors and to deliberate with a view to reaching an agreement if you can do so without violating your judgment.... [N]one of you should surrender your honest conviction as to the weight, the affect [sic] ... of evidence or lack of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."
 
 
 18
 When the jury indicated again at 3:45 p.m. that it was hung, the judge suggested that they "try again" the next day, but she did not read an Allen instruction at that time. The next day, when the jury indicated for a third time that it was hung, the judge gave an instruction that reiterated the importance of voting one's conscience. In short, the trial judge made it clear that each juror should vote in accordance with the juror's convictions.
 
 
 19
 Third, the trial judge did not suggest that a hung jury was an unacceptable result in Green's case. In United States v. Scott, supra, the court held that a charge was impermissibly coercive where the judge told the jurors that if they did not reach a verdict, they would wreak havoc on the judge's trial schedule. The judge informed the jury that a civil trial was scheduled to follow the case at hand and that the civil litigants had been waiting for four years for a trial. The judge indicated that a hung jury would mean that the criminal case would have to be re-tried immediately, thus delaying the trial in the civil case. The court of appeals found that these statements were coercive because they "could be understood by the jury as an admonishment to reach a verdict in order to get the case out of the way, for the sake of a harried judge and long-suffering civil parties." Id. at 337.
 
 
 20
 Although the judge in the case at bar made several comments about the need for a verdict, her comments do not rise to the level of coercion present in Scott. Green points to several statements by the trial judge and argues that the court was unwilling to let the jury remain deadlocked. For example, when the jury indicated that it was deadlocked after only two hours of deliberation, the judge said: "There's no way you've given this the time and thought it needs. I'm not releasing you." After reading the Allen instruction the first time, the court added: "You cannot give this a specious treatment, you have to delve deeply into this matter."
 
 
 21
 Similarly, at the end of the first day when the jury again indicated that it was deadlocked, the judge excused the jurors but reminded them that "You're still on jury duty. You will continue to deliberate [tomorrow]." Finally, when the jury indicated for the third time that it was deadlocked, the judge said,
 
 
 22
 I am still of the opinion that you have not deliberated long enough.... It's not uncommon that juries deliberate three to four days and upwards so if I feel that that's necessary in order for you to follow the instructions and apply the law to the facts that you find them to be I'm going to use my authority to keep you ... and that's within my purview.... It may be that you are in fact a hung jury but I think you need to give it another try and I'm not going to let you go.
 
 
 23
 These admonitions are arguably coercive, but in the totality of the circumstances, their effect is not enough to warrant a grant of a writ of habeas corpus. The judge did not rule out the possibility that the jury might indeed be irretrievably deadlocked: she simply indicated that the jurors had not worked hard enough to reach a verdict. Moreover, on two occasions she reminded the jurors to remain true to their "honest convictions."
 
 
 24
 Consequently, the Allen instruction and the judge's comments did not unfairly prejudice Green. The court did not target the dissenting jurors, if any, in her instructions; she reminded them that they should reach a verdict only if it did not violate any juror's judgment; and she did not indicate that the jury had to reach a verdict before she released them from duty. Moreover, the judge's second instruction was brief and the jury deliberated for over four hours after it received the second instruction. Considering the totality of these circumstances, we hold that any variation from the approved Allen charge was de minimis and was not coercive. Therefore, the district court was correct when it determined that Green was not prejudiced by the trial court's Allen instructions.
 
 B
 
 25
 Green's second argument is that the trial court erred when it refused to give an instruction on "mere presence." Green requested the instruction but the judge did not give it.[2] Green, however, failed to object contemporaneously to the judge's failure to give the instruction. Consequently, this court cannot consider Green's objection to the judge's failure to include the "mere presence" instruction in her charge to the jury. "[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a ' "fundamental miscarriage of justice." ' " Harris v. Reed, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043 (1989) (citations omitted). The last state court rendering a judgment in the case, however, must clearly state that its judgment rests on a state procedural bar. Harris, 489 U.S. at 263, 109 S.Ct. at 1043. In this case, the Michigan Court of Appeals, the last state court rendering a judgment on this issue, clearly stated that "[w]hen a trial court agrees to give an instruction as requested to do so by defense counsel and then inadvertently neglects to do so, appellate review, absent a resultant miscarriage of justice[,] is precluded when defense counsel fails to raise the issue in the trial court."
 
 
 26
 Despite this procedural bar, Green argues that a fundamental miscarriage of justice will occur if his claim is barred. Even if Green had preserved this argument for review, he would be entitled to the requested jury instruction only if the evidence at his trial supported the instruction. United States v. Bryant, 716 F.2d 1091, 1094 (6th Cir.1983), cert. denied, 465 U.S. 1009, 104 S.Ct. 1006 (1984). Green argues that he was not responsible for the death of Williams and he did not aid and abet Hunter. By Green's own admission, however, he knew that Hunter was going to rob someone and that both he and Hunter were armed. Moreover, Green admitted that he shot at the victims. Green has not indicated what evidence, if any, suggests that he was merely present at the scene of the crime. Consequently, even if Green had preserved his objection, it does not appear that the evidence supported an instruction on "mere presence."
 
 C
 
 27
 Green also argues that the trial court's refusal to instruct the jury on the lesser included offense of felonious assault violated his constitutional rights. Generally, federal habeas corpus relief is not available for errors of state law, such as claims for failure to instruct on a lesser included offense. Estelle v. McGuire, 112 S.Ct. 475, 480 (1991); Bagby v. Sowders, 894 F.2d 792, 797 (6th Cir.) (en banc) (plurality), cert. denied, 496 U.S. 929, 110 S.Ct. 2626 (1990). Such a claim may be cognizable, however, if the failure to instruct on the lesser included offense is "such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure[.]" Bagby, 894 F.2d at 797.
 
 
 28
 In Green's case, the failure to give the instruction was error under state law, but it did not result in a miscarriage of justice. The Michigan Court of Appeals found that the instruction was warranted in Green's case, but concluded that the error was harmless. The court based its decision on the fact that the jury had been instructed on the lesser included offense of "assault with intent to do great bodily harm less than murder." The jury, however, convicted Green of the greater charge of assault with intent to murder. The Michigan court concluded that the jury's rejection of one lesser included offense made it "highly unlikely" that the jury would have convicted Green on an even less serious charge.
 
 
 29
 We agree with the analysis of the Michigan Court of Appeals. Furthermore, Green has failed to allege any facts upon which this court could conclude that the failure to charge the jury on the lesser included offense of felonious assault rises to the level of a fundamental miscarriage of justice. Consequently, the district court correctly determined that the failure to charge the jury on the lesser included offense was not grounds for granting Green's petition.
 
 D
 
 30
 Green's final argument is that the prosecutor referred to facts not in evidence and gave erroneous instructions to the jury during the course of his closing statement and that these errors violated Green's right to a fair trial.[3] "This court grants habeas corpus relief for prosecutorial improprieties where the prosecutor's statements are so egregious as to render the entire trial 'fundamentally unfair.' " Martin v. Parker, 11 F.3d 613, 616 (6th Cir.1993) (quoting Angel v. Overberg, 682 F.2d 605, 608 (6th Cir.1982)). The court should
 
 
 31
 "consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused."
 
 
 32
 Angel, 682 F.2d at 608 (quoting United States v. Leon, 534 F.2d 667, 679 (6th Cir.1976)).
 
 
 33
 Green first argues that the prosecutor improperly instructed the jury during closing argument when he said "Define [sic] first degree premeditated murder you must find a specific intent to kill, no getting around that. If a person only intends to wound, only intends to hurt, that can't be first degree premeditated murder, that's second degree murder." This statement was misleading since second degree murder in Michigan requires the actor to have one of the following three intents: the intent to kill; the intent to do great bodily harm; or the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. People v. Dykhouse, 345 N.W.2d 150, 151 (Mich.1984).
 
 
 34
 Although the prosecutor misled the jury on this point, the false impression was corrected by the trial judge. First, the trial judge reminded the jury that it was bound to follow the instructions that she gave. Second, she properly instructed the jury as to the elements of second degree murder. Green has failed to show that the judge's comments did not cure the prosecutor's mistake. Consequently, there is no basis for finding that this mistake rendered the entire trial fundamentally unfair.
 
 
 35
 Green's second complaint is that the prosecutor argued facts not in evidence. The prosecutor made the following statement during his closing argument:
 
 
 36
 When Leon says after they take the money, they look at each other and there's a nod and after the nod then the contact wound, then the firing, then jogged in the back and pulled the trigger. That concert of action between the two of them, the signal, well let's go, let's get rid of these guys.
 
 
 37
 (Emphasis added). Higgins testified, however, that Green and Hunter made eye contact before the shooting began. The Michigan Court of Appeals found that the "prosecutor was merely relating the facts adduced at trial to his theory of the case."
 
 
 38
 Since there was no direct evidence of a "nod," the state court's conclusion is somewhat overstated.[4] Still, the misleading comment was not so egregious as to warrant granting Green's petition. First, although the comment had a tendency to bolster the prosecution's theory of the case, i.e. concert of action between Green and Hunter, there was evidence of concert of action already before the jury. Second, the comment was an isolated one. Third, the prosecution had strong evidence to support its theory of the case; thus the comment likely had little effect on the jury. Finally, the judge told the jury that "[a]ny statements or arguments of the attorneys are not themselves evidence but are only intended to assist you in understanding the viewpoint and theory of each party." In light of these facts, the prosecutor's reference to a fact arguably not in evidence did not render the entire trial fundamentally unfair.
 
 
 39
 For the reasons stated above, we AFFIRM the district court's denial of Green's petition for a writ of habeas corpus.
 
 
 
 [1]
 In Allen, the Supreme Court approved supplemental instructions that emphasized the following:
 [I]n a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgement which was not concurred in by the majority.
 Allen, 164 U.S. at 501, 17 S.Ct. at 157.
 
 
 [2]
 In his brief, Green argues that the judge "implicitly agreed" to give the instruction. The colloquy on this issue is as follows:
 THE COURT: Would you like the mere presence instructions?
 MR. ROTH: That's right.
 THE COURT: Any others?
 MR. ROTH: Thank you very much, Judge, that's all.
 We express some doubt as to whether this exchange amounts to an "implicit agreement," but for the purpose of this appeal, we will assume, without deciding, that the trial judge did, in fact, agree to give a "mere presence" instruction.
 
 
 [3]
 Green failed to object to these comments and was presumably barred from raising the issue in the state court. The Michigan Court of Appeals, however, reached the merits of Green's claim of prosecutorial misconduct. Consequently, the decision on the merits in the state court lifts the procedural bar. Ylst v. Nunnemaker, 111 S.Ct. 2590, 2593-94 (1991) ("[s]tate procedural bars are not immortal")
 
 
 [4]
 Higgins testified that Hunter and Green "looked at each other and then they just started shooting." One could infer that Higgins noticed Hunter and Green make eye contact because one of the two moved his head