## ALLEN *v.* UNITED STATES.

### ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 371. Submitted October 23, 1896. — Decided December 7, 1896.

There is no error in an instruction that evidence recited by the court to the jury leaves them at liberty to infer not only wilfulness, but malice aforethought, if the evidence is as so recited.

There is no error in an instruction on a trial for murder that the intent necessary to constitute malice aforethought need not have existed for any particular time before the act of killing, but that it may spring up at the instant, and may be inferred from the fact of killing.

The language objected to in the sixth assignment of error is nothing more than the statement, in another form, of the familiar proposition that every man is presumed to intend the natural and probable consequences of his own act.

Mere provocative words, however aggravating, are not sufficient to reduce a crime from murder to manslaughter.

To establish a case of justifiable homicide it must appear that the assault made upon the prisoner was such as would lead a reasonable person to believe that his life was in peril.

There was no error in the instruction that the prisoner was bound to retreat as far as he could before slaying his assailant. *Beard* v. *United States,*

158 U. S. 550, and *Alberty* v. *United States*, 162 U. S. 499, distinguished from this case.

Flight of the accused is competent evidence against him, as having a tendency to establish guilt; and an instruction to that effect in substance is not error, although inaccurate in some other respects which could not have misled the jury.

The refusal to charge that where there is a probability of innocence there is a reasonable doubt of guilt is not error, when the court has already charged that the jury could not find the defendant guilty unless they were satisfied from the testimony that the crime was established beyond a reasonable doubt.

The seventeenth and eighteenth assignments were taken to instructions given to the jury after the main charge was delivered, and when the jury had returned to the court, apparently for further instructions. These instructions were quite lengthy and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other ; that it was their duty to decide the case if they could conscientiously do so ; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. *Held*, that there was no error.

THE facts constituting the offence for which Allen was indicted are set forth in *Allen* v. *United States*, 150 U. S. 551, and 157 U. S. 675. The rulings passed upon in the present case are stated in the opinion of the court.

No appearance for plaintiff in error.

*Mr. Solicitor General* for defendants in error.

MR. JUSTICE BROWN delivered the opinion of the court.

This was a writ of error to a judgment of the Circuit Court of the United States for the Western District of Arkansas sentencing the plaintiff in error to death for the murder of Philip

Henson, a white man, in the Cherokee Nation of the Indian Territory. The defendant was tried and convicted in 1893, and upon such conviction being set aside by this court, 150 U. S. 551, was again tried and convicted in 1894. The case was again reversed, 157 U. S. 675, when Allen was tried for the third time and convicted, and this writ of error was sued out.

The facts are so fully set forth in the previous reports of the case that it is unnecessary to repeat them here.

We are somewhat embarrassed in the consideration of this case by the voluminousness of the charge, and of the exceptions taken thereto, as well as by the absence of a brief on the part of the plaintiff in error; but the principal assignments of error, set forth in the record, will be noticed in this opinion.

1. The third assignment of error is taken to certain language in the charge, the material portion of which is as follows:

"If you believe the story as narrated by the two Erne boys, who testified as witnesses, is true — that is, that the defendant went up to the fence with his pistol; that he went through the wire fence, and went out in the wheat field where Philip Henson was, and met him, first halloed at him, placed his pistol upon the fence and stopped the boys, and then went through the wire fence and went out to where he was, and struck him first in the mouth with his left fist, and at the same time undertook to fire upon him, and that that firing was prevented by the action of Henson in taking hold of the pistol, and it went off into the ground, and then he fired at him and struck him in the side, and then he fired at him and struck him in the back, you have a state of facts which would authorize you to say that the killing was done wilfully; and, not only that, but to say that it was done with malice aforethought, because that state of case, if that be true, would show the doing of a wrongful act, an illegal act, without just cause or excuse, and in the absence of mitigating facts to reduce the grade of the crime."

The learned judge was stating in this connection the theory of the prosecution, and if the facts were as stated by the

Ernes, there was no error in saying to the jury, not that they were bound to, but that they were at liberty to, infer not only wilfulness but malice aforethought.

2. The fourth assignment was to the following language:

"How can you find a deliberate intent to kill? Do you have to see whether or not the man had that intent or not in his mind a year or month or day or an hour? Not at all, for in this age of improved weapons, when a man can discharge a gun in the twinkling of an eye, if you see a man draw one of these weapons and fire it, and the man toward whom he presents it falls dead, you have a deliberate intent to kill, as manifested by the way he did that act. You have the existence of a deliberate intent, though it may spring up on the spur of the moment — as it were, spring up cotemporaneous with the doing of it — evidenced by shooting of the man, if the act was one he could not do under the law and then claim it was manslaughter, or an act that he could not do in self-defence from the fact that it was done without just cause or excuse, or in the absence of mitigating facts, and that is precisely the definition of this characteristic of murder, known as malice aforethought. It does not, as I have already told you, necessarily import any special malevolence towards the individual slain, but also includes the case of a generally depraved, wicked and malicious spirit, a heart regardless of social duty, and a mind deliberately bent on mischief. It imports premeditation. Malice, says the law, is an intent of the mind and heart."

The substance of this instruction is that the intent necessary to constitute malice aforethought need not have existed for any particular time before the act of killing, but that it may spring up at the instant and may be inferred from the fact of killing. This is within the authorities as applied to the common law crime of murder, though where the crime is classified as in some States, proof of deliberate premeditation is necessary to constitute murder in the first degree. *United States* v. *Cornell*, 2 Mason, 91; *People* v. *Clark*, 7 N.Y. 385; Whart. on Homicide, § 33; Whart. on Crim. Law, 10th ed. § 117.

3. The sixth assignment is to the following language :

"The law says we have no power to ascertain the certain condition of a man's mind. The best we can do is to infer it more or less satisfactorily from his acts. A person is presumed to intend what he does. A man who performs an act which it is known will produce a particular result is from our common experience presumed to have anticipated that result and to have intended it. Therefore we have a right to say, and the law says, that when a homicide is committed by weapons indicating design that it is not necessary to prove that such design existed for any definite period before the fatal blow was fired. From the very fact of a blow being struck, from the very fact that a fatal bullet was fired, we have the right to infer as a presumption of fact that the blow was intended prior to the striking, although at a period of time inappreciably distant."

This is nothing more than a statement of the familiar proposition that every man is presumed to intend the natural and probable consequences of his own act. 1 Greenl. Ev. § 18; *Regina* v. *Jones,* 9 C. & P. 258 ; *Regina* v. *Hill,* 8 C. & P. 274 ; *Regina* v. *Beard,* 8 C. & P. 143 ; *People* v. *Herrick,* 13 Wend. 87, 91.

4. The eighth assignment is taken to the following definition of manslaughter :

"It is the killing of a man unlawfully and wilfully, but without malice aforethought. Malice aforethought, as I have defined it to you, must be excluded from it ; that is, the doing of a wrongful act without just cause or excuse and in the absence of mitigating facts in such a way as to show a heart void of social duty and a mind fatally bent upon mischief must be out of the case. If that is driven out of the case, then if it is a crime at all, it must come under this statute ; it must come under this definition of the crime of manslaughter. The common law, which I will read to you, defines it in the same way. It tells you in a little broader terms what kind of conditions it springs out of. Speaking of voluntary manslaughter, it says it is the wilful and unlawful killing of another on sudden quarrel or in the heat of passion. Let us see what is meant

by this definition. The party who is killed, at the time of the killing, must offer some provocation to produce a certain condition of mind. Now, what is the character of that provocation that can be recognized by the law as being sufficient to reduce the grade of the crime from murder to manslaughter? He cannot produce it by mere words, because mere words alone do not excuse even a simple assault. Any words offered at the time do not reduce the grade of the killing from murder to manslaughter. He must be doing some act — that is, the deceased, Philip Henson in this case, the party killed — which at the time is of a character that would so inflame the mind of the party who does the killing as that the law contemplates he does not act deliberately, but his mind is in a state of passion ; in a heat of passion where he is incapable of deliberating."

There is no error in this instruction. It is well settled by the authorities that mere words, however aggravating, are not sufficient to reduce the crime from murder to manslaughter. *Commonwealth* v. *York,* 9 Met. (Mass.) 93, 103; Whart. on Homicide, § 393; Whart. on Crim. Law, 10th ed. § 455a.

5. The ninth alleged error turned upon the statement made by the court of the circumstances under which the killing would be justifiable :

" It does not mean that defendant was assaulted in a slight way, or that you can kill a man for a slight attack. The law of self-defence is a law of proportions as well as a law of necessity, and it is only danger that is deadly in its character, or that may produce great bodily harm, against which you can exercise a deadly attack. If he is attacked by another in such a way as to denote a purpose to take away his life, or to do him some great bodily harm from which death or permanent injury may follow, in such a case he may lawfully kill the assailant. When? Provided he use all the means in. his power otherwise to save his own life or prevent the intended harm, such as retreating as far as he can, or disabling him without killing him, if it be in his power. The act coming from the assailant must be a deadly act, or an act that would produce great violence to the person, under this proposition. It means an act that is hurled against him, and that

he has not created it, or created the necessity for it by his own wrongful, deadly or dangerous conduct — conduct threatening life. It must be an act where he cannot avoid the consequences. If he can, he must avoid them, if he can reasonably do so with due regard to his own safety."

It is clear that to establish a case of justifiable homicide it must appear that something more than an ordinary assault was made upon the prisoner; it must also appear that the assault was such as would lead a reasonable person to believe that his life was in peril. *Wallace* v. *United States*, 162 U. S. 466.

Nor is there anything in the instruction of the court that the prisoner was bound to retreat as far as he could before slaying his assailant that conflicts with the ruling of this court in *Beard* v. *United States*, 158 U. S. 550. That was the case of an assault upon the defendant upon his own premises, and it was held that the obligation to retreat was no greater than it would have been if he had been assailed in his own house. So, too, in the case of *Alberty* v. *United States*, 162 U. S. 499, the defendant found the deceased trying to obtain access to his wife's chamber through a window, in the night time, and it was held that he might repel the attempt by force, and was under no obligation to retreat if the deceased attacked him with a knife. The general duty to retreat instead of killing when attacked was not touched upon in these cases. Whart. on Homicide, § 485.

6. The fourteenth assignment is to the following language of the court upon the subject of the flight of the accused after the homicide: "Now, then, you consider his conduct at the time of the killing and his conduct afterwards. If he fled, if he left the country, if he sought to avoid arrest, that is a fact that you are to take into consideration against him, because the law says unless it is satisfactorily explained — and he may explain it upon some theory, and you are to say whether there is any effort to explain it in this case — if it is unexplained the law says it is a fact that may be taken into account against the party charged with the crime of murder upon the theory that I have named, upon the existence of this monitor

called conscience that teaches us to know whether we have done right or wrong in a given case."

In the case of *Hickory* v. *United States*, 160 U. S. 408, 422, where the same question, as to the weight to be given to flight as evidence of guilt, arose, the court charged the jury that "the law recognizes another proposition as true, and it is that 'the wicked flee, when no man pursueth, but the innocent are as bold as a lion.' That is a self-evident proposition that has been recognized so often by mankind that we can take it as an axiom and apply it to this case." It was held that this was error, and was tantamount to saying to the jury that flight created a legal presumption of guilt, so strong and conclusive, that it was the duty of the jury to act on it as an axiomatic truth. So, also, in the case of *Alberty* v. *United States*, 162 U. S. 499, 509, the court used the same language, and added that from the fact of absconding the jury might infer the fact of guilt, and that flight was a silent admission by the defendant that he was unwilling or unable to face the case against him, and was in some sense feeble or strong, as the case might be, a confession. This was also held to be error. But in neither of these cases was it intimated that the flight of the accused was not a circumstance proper to be laid before the jury as having a tendency to prove his guilt. Several authorities were quoted in the *Hickory case*, (p. 417,) as tending to establish this proposition. Indeed, the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt. Whart. on Homicide, § 710; *People* v. *Pitcher*, 15 Michigan, 397.

This was the substance of the above instruction, and although not accurate in all its parts we do not think it could have misled the jury.

7. In the fifteenth assignment exception is taken to the following instruction : " You will understand that your first duty in the case is to reject all evidence that you may find to be false ; all evidence that you may find to be fabricated, because it is worthless ; and if it is purposely and intentionally invoked by the defendant it is evidence against him ; it is the basis for

a presumption against him, because the law says that he who resorts to perjury, he who resorts to subornation of perjury to accomplish an end, this is against him, and you may take such action as the basis of a presumption of guilt." There was certainly no error in instructing the jury to disregard evidence that was bound to be false, and the further charge that false testimony, knowingly and purposely invoked by defendant, might be used against him, is but another method of stating the principle that the fabrication of testimony raises a presumption against the party guilty of such practice. 1 Phillips' Evidence, 448; *State v. Williams*, 27 Vermont, (1 Williams,) 724; 3 Russell on Crimes, 6th ed. 358.

8. The sixteenth assignment was to the refusal of the court to charge the jury that where there is a probability of innocence there is a reasonable doubt of guilt. In the case of *Coffin v. United States*, 156 U. S. 432, 452, it was held that a refusal of the court to charge the jury upon the subject of the presumption of innocence was not met by a charge that they could not convict unless the evidence showed guilt beyond a reasonable doubt.

In the case under consideration, however, the court had already charged the jury that they could not find the defendant guilty unless they were satisfied from the testimony that the crime was established beyond a reasonable doubt. That this meant, "first, that a party starts into a trial, though accused by the grand jury with the crime of murder, or any other crime, with the presumption of innocence in his favor. That stays with him until it is driven out of the case by the testimony. It is driven out of the case when the evidence shows, beyond a reasonable doubt, that the crime as charged has been committed, or, that a crime has been committed. Whenever the proof shows, beyond a reasonable doubt, the existence of a crime, then the presumption of innocence disappears from the case. That exists up to the time that it is driven out in that way by proof to that extent." The court having thus charged upon the subject of the presumption of innocence, could not be required to repeat the charge in a separate instruction at the request of the defendant.

9. The seventeenth and eighteenth assignments were taken to instructions given to the jury after the main charge was delivered, and when the jury had returned to the court, apparently for further instructions. These instructions were quite lengthy and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. These instructions were taken literally from a charge in a criminal case which was approved of by the Supreme Court of Massachusetts in *Commonwealth* v. *Tuey*, 8 Cush. 1, and by the Supreme Court of Connecticut in *State* v. *Smith*, 49 Connecticut, 376, 386.

While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury-room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally

honest and intelligent as himself. There was no error in these instructions.

Several other assignments were made, to which it is unnecessary to call attention.

For the reasons above stated the judgment of the court below will be

*Affirmed.*