UNITED STATES of America, Plaintiff–
Appellee/Cross–Appellant,

v.

Rosalind K. REED, Defendant–
Appellant/Cross–Appellee.

No. 97–1860, 97–1957.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 9, 1998.

Decided Feb. 11, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied April 9, 1999.

986

Neil H. Fink (briefed), David A. Koelzer (briefed), Law Offices of Neil H. Fink, Birmingham, Michigan, Mark J. Kriger (argued and briefed), Law Offices Of Mark J. Kriger, Detroit, Michigan, for Defendant–Appellant/Cross–Appellee.

Wayne F. Pratt (argued and briefed), Ronald W. Waterstreet, Assistant U.S. Attorney (briefed), Detroit, Michigan, for Plaintiff–Appellee/Cross–Appellant.

Before: WELLFORD, BOGGS, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Rosalind K. Reed was convicted in the district court of conspiracy to commit money laundering pursuant to 18 U.S.C. § 1956(a)(1)(A)(i) and received a sentence of forty-six months. On appeal Reed argues, inter alia, that certain evidence was impermissibly excluded from her trial, that the district court gave the jury a coercive *Allen* charge, and that the evidence regarding her intent was insufficient to sustain her conviction. For the reasons discussed below, we **AFFIRM** Reed's conviction.

The government cross-appeals the sentence imposed, which reflected a downward departure of seventy-five months. We con-

clude that the district court abused its discretion in granting this departure. Accordingly, we **VACATE** the sentence imposed and **REMAND** the case for resentencing.

## I. FACTS AND PROCEDURAL HISTORY

This case arises out of a large marijuana distribution conspiracy. Principals in the conspiracy included Richard Sumpter, who supplied marijuana from California, and Jerome Maddox, who acted as Sumpter's Detroit distributor. The testimony of Sumpter and Maddox, who ultimately cooperated with the authorities after their arrests, and others established the following:

Reed, a criminal defense attorney, was a friend and neighbor of Maddox. Sumpter was arrested in Detroit in January 1994, and Reed, at Maddox's request, undertook Sumpter's representation. Sumpter, while in custody, told Reed that he could not pay her legal fees unless Maddox paid off his drug debt (something in excess of $400,000). Reed agreed to act as a conduit for the flow of money and information between Sumpter and Maddox. On two occasions Maddox delivered large quantities of cash to Reed's law office and was met by Diana Fitch, Sumpter's wife. After Maddox and Fitch counted the money and gave a portion to Reed for legal fees, the remainder was left in Reed's office for subsequent pick up by Sumpter's courier, David "Flyboy" Delacour. On instructions from Reed, Selecia Wright, Reed's receptionist, gave the first bag of money to Delacour. A second receptionist, Diane McElroy, gave the second bag to Delacour on instructions from Fitch when Delacour arrived while Reed was out of the country. On his return to California from this second trip, Delacour was arrested, and the bag was found to contain $90,000 in currency.

In addition to her knowingly facilitating this transfer of cash, the testimony indicated that Reed delivered notes from Sumpter to Maddox while Sumpter was jailed, that she discussed with Maddox Sumpter's plan to continue running the drug operation while he was jailed, and that she discussed Maddox's drug debt with Fitch. Eventually, Sumpter

and Maddox agreed to cooperate with the authorities, and as part of that cooperation both men recorded conversations with Reed in which they attempted to capture Reed making inculpatory statements. Instead, Reed persistently denied involvement in or knowledge of any criminal activity.

On October 6, 1994 Reed was indicted on charges of money laundering, conspiracy to commit money laundering, and conspiracy to distribute marijuana. Pretrial, the government asked for a jury instruction that the delivery of cash could constitute a "financial transaction" for the purposes of the federal money laundering statute. Believing that the instruction was foreclosed by circuit precedent and given the prosecution's admission that no other transaction could be proven, the district court dismissed the money laundering counts. On appeal this court, sitting en banc, overruled contrary precedent and held that the delivery of cash as alleged in the indictment did constitute a "financial transaction." *See United States v. Reed,* 77 F.3d 139 (6th Cir.) (en banc) (*"Reed I "*), *cert. denied,* 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).

On March 20, 1996 Reed was re-indicted. After the district court denied Reed's motion to dismiss on the basis of an ex post facto prosecution under the money laundering statute, the case proceeded to trial. After lengthy deliberations, described below, the jury convicted Reed of conspiracy to commit money laundering, acquitted her of conspiracy to distribute marijuana and of one substantive money laundering count, and deadlocked over the remaining money laundering count, as to which a mistrial was declared. Following sentencing, Reed appealed her conviction, while the government cross-appealed the sentence imposed.

## II. ANALYSIS

In appealing her conviction, Reed asserts a number of trial errors. We have jurisdiction to consider her appeal pursuant to 28 U.S.C.

§ 1291. In its cross-appeal, the government claims that the district court erred in sentencing Reed. Jurisdiction to hear this appeal is provided by 18 U.S.C. § 3742.

### A. The Admissibility of Certain Recorded Conversations

■ Reed sought to introduce a tape recording of a conversation between Sumpter and herself and arguably would have sought to introduce a recording of a similar conversation between Maddox and herself, if not for the district court's ruling that the Sumpter recording was inadmissible as hearsay. In reviewing a trial court's evidentiary determinations, this court reviews de novo the court's conclusions of law, e.g., the decision that certain evidence constitutes hearsay, *see United States v. Branham,* 97 F.3d 835, 851 (6th Cir.1996), and reviews for clear error the court's factual determinations that underpin its legal conclusions. *See United States v. Clark,* 18 F.3d 1337, 1341 (6th Cir.), *cert. denied,* 513 U.S. 852, 115 S.Ct. 152, 130 L.Ed.2d 91 (1994).

■ In the taped conversation with Sumpter, Reed stated that she was not involved in the transportation of drug money and that she had no knowledge that her office was being used to facilitate such transfers. J.A. at 215–26. Because Sumpter did not refute these assertions and generally responded "yeah" or "I understand," Reed argued at trial that portions of the conversation should have been admitted pursuant to Federal Rule of Evidence 613(b) in order to impeach Sumpter's trial testimony that helped to establish that Reed was a knowing participant in the transportation and laundering of drug money.[1]

The district court determined that Sumpter's utterances on the tape were not statements as such. Rather than signaling agreement with Reed's statements, Sumpter's responses of "yeah" and "I understand" merely indicated his attentiveness and par-

---

1. Federal Rule of Evidence 613(b) provides that [e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

ticipation in the conversation. Moreover, citing *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), the court determined that Sumpter's failure to refute Reed's assertions was not probative because under the circumstances it would not have been natural for Sumpter to have contested Reed's denial of involvement.

The district judge did not clearly err in finding Sumpter's utterances not to be statements and in finding his failure to refute Reed's assertions not to be probative. In the taped conversation Sumpter was attempting to capture Reed making inculpatory admissions. Taking an adversary position toward Reed would have risked tipping Reed off to Sumpter's cooperation with the authorities or, at the least, would have risked alienating her and causing her to cut short the phone call. Even if Sumpter's surveillance tactics were not exemplary, the circumstances of the call were not natural, and Sumpter's responses cannot be taken at face value. The cases cited by Reed on this point are not to the contrary and simply reinforce the rule "that the determination of whether statements are in fact inconsistent is committed to the sound discretion of the district court." *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir.1988); *see also United States v. Causey*, 834 F.2d 1277, 1282 (6th Cir.1987), *cert. denied*, 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988).

■ On appeal Reed argues additionally that the tape of her conversation with Maddox was improperly excluded from evidence and that both tapes should have been admitted into evidence pursuant to Rule 801(d)(2)(D) as admissions by a party opponent. Neither contention is meritorious.

Reed did not attempt to introduce the Maddox tape after the court ruled the Sumpter tape inadmissible. At one point the prosecution noted at a sidebar that it intended to ask the court to exclude the Maddox tape

and that it assumed that the ruling on the Sumpter tape would apply. It is clear, however, that the district judge did not rule on the matter at this time.[2] Citing *Douglas v. Alabama*, 380 U.S. 415, 422, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), Reed argues that she was not required to object to the government's suggestion that the Maddox tape be excluded, because such an objection would have been futile in light of the ruling on the Sumpter tape. The exclusion of that tape, however, turned on the court's factual determination that the utterances of Sumpter were not statements. The district court made no such ruling regarding the purported statements of Maddox.[3]

We decline to consider Reed's argument regarding the admissibility of the Maddox tape. Federal Rule of Criminal Procedure 52(b) permits this court to notice "[p]lain errors or defects affecting substantial rights ... although they were not brought to the attention of the [district] court." However, "[t]he first limitation on appellate authority under Rule 52(b) is that there indeed be an 'error.'" *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Because Reed did not attempt to introduce this evidence, and because the district court was not asked to rule and did not rule even indirectly on its admissibility, there could be no error on the part of the district court for this court to notice. Moreover, even if the district court had extended its ruling on the Sumpter tape to include the Maddox tape, such a ruling would not constitute error. Although Maddox was more expressive than Sumpter, the circumstances of the tapings were the same, and Maddox's responses must be viewed as an attempt to lead Reed to make damaging admissions rather than as a concurrence in her protestations of innocence.

■ Although at trial Reed offered several bases for the admission of the Sumpter tape,

---

**2.** It is equally clear that the court's ruling on the admissibility of the Sumpter tape was limited to that tape. Reed did mention the Maddox tape in her second memorandum on the admissibility question, but in the October 8, 1996 hearing the court ruled only on the admissibility of the April 1, 1994 conversation with Sumpter.

**3.** Reed's futility argument is undermined by the contention in her appellate brief that the responses of Maddox included direct replies that went far beyond the "yeahs" of Sumpter. In fact, excerpts from the Maddox tape dominate the portion of Reed's appellate brief in which she describes the content of the taped conversations.

she did not argue there that the tape constituted an admission of a party opponent pursuant to Rule 801(d)(2)(D), as she does before this court. Therefore, this court reviews this contention under a plain error standard. *See United States v. Evans,* 883 F.2d 496, 499 (6th Cir.1989) ("The 'plain error' rule also applies to a case, such as this, in which a party objects to [an evidentiary determination] on specific grounds in the trial court, but on appeal the party asserts new grounds challenging [that determination]."); *see also United States v. Cox,* 957 F.2d 264, 267 (6th Cir.1992).

■ Rule 801(d)(2)(D) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship...." Reed's theory is that Sumpter and Maddox acted as the government's agents in taping the conversations and that their taped statements thus may be admitted against the government. To a certain extent Reed is correct. Sumpter and Maddox were acting as agents of the government, and this court has interpreted "a matter within the scope of the agency" broadly enough that "statements" of Sumpter or Maddox would be admissible against the government. *See Branham,* 97 F.3d at 851 (conversations between government informant and criminal defendant were designed to establish trust, and anything said by the informant was within the scope of the agency). With regard to the Sumpter tape, however, the district court determined that Sumpter's utterances were not "statements" and that Sumpter's failure to contest Reed's allegedly false assertions was not probative. Given that ruling, which was not clearly erroneous, the court did not err, and thus there could be no plain error in excluding this evidence despite Rule 801(d)(2)(D).[4] More-

over, as noted above, Reed relinquished any argument related to the admissibility of the Maddox tape by failing to move to introduce this testimony at trial.

■ Finally, if the district court erred in excluding the Sumpter tape pursuant to Rule 613(b) (or pursuant to any other basis argued by Reed at trial), that error was not prejudicial and was harmless. *See Olano,* 507 U.S. at 734, 113 S.Ct. 1770. As the government notes, the testimony of Sumpter was extensively impeached, and the uncontroverted evidence of Fitch and two receptionists regarding the retrieval of suitcases from Reed's office fully supported Reed's conviction.

## B. The *Allen* Charge and Related Matters

■ On the twelfth day of deliberations the district judge read to the jury Sixth Circuit Pattern Instruction 9.04, otherwise known as the *Allen* charge,[5] exhorting the jurors to continue their deliberations in an open-minded fashion. Shortly thereafter, the judge interviewed each juror individually to inquire into reported juror misconduct, and then the judge made several further comments to the jury. In light of the surrounding investigation and the further comments of the court, Reed argues that the *Allen* charge was coercive. We review the district court's decision to give the *Allen* charge and the court's management of reported juror misconduct under an abuse of discretion standard. *See United States v. Frost,* 125 F.3d 346, 373 (6th Cir.1997) (*Allen* charge), *cert. denied,* — U.S. ——, ——, 119 S.Ct. 40, 41, 142 L.Ed.2d 32 (1998); *United States v. Shackelford,* 777 F.2d 1141, 1145 (6th Cir. 1985) (jury misconduct proceedings), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986). We conclude that the district court did not abuse its discretion in this instance.

---

4. The fact that the *Branham* court held that "anything said" by the informant was within the scope of the agency does not imply that "anything said" would be admissible. Nothing in *Branham* forecloses the argument that certain utterances do not constitute statements. Even if this tape were admissible under the *Branham* analysis, however, its exclusion would not rise to plain error. As noted in the following para-

graph, the exclusion of this tape was not prejudicial.

5. The instruction is known as the *Allen* charge because it is modeled after an instruction approved by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

■ The totality of the circumstances in which the *Allen* charge was given must be examined to determine whether the charge was coercive. *See Williams v. Parke,* 741 F.2d 847, 850 (6th Cir.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1399, 84 L.Ed.2d 787 (1985). Thus, those circumstances must be recounted at some length.

■ Although not fruitful, the jury deliberations were uneventful until the afternoon of the sixth day of deliberations, November 22, when the judge's clerk was summoned to the jury room. Juror Williams told the clerk that he had a question for the judge, that he had had enough of deliberations, and that he wanted to take a nap. Another juror or jurors stated that Williams was not participating. Williams then said to the clerk, "But what if I found out that a juror had evidence … ?" The clerk stopped Williams before he could complete the thought, and she did not perceive the full substance of Williams's concern. J.A. at 1141–43. The judge discussed this incident with counsel on Monday, November 25, but apparently decided to take no action at this time.

On Wednesday, November 27, the judge and counsel met with Williams to allow Williams to voice his concerns about the conduct of other jurors. Williams told the court that some jurors were holding discussions out of the hearing of other members of the panel and that some jurors were taking home hand-written copies of certain exhibits. He also voiced a vague concern about "compromising a decision." J.A. at 1148–49. After extensive discussions with counsel, the judge determined that nothing that Williams had told them warranted a mistrial and that deliberations should continue. Some uncertainty remained, however, regarding Williams's earlier comment about a juror having evidence.

On Tuesday, December 3, the second day of deliberations following the Thanksgiving break and the eleventh day overall, the district court received two notes from the jury. One note said that the jury had been unable to reach a unanimous decision on any of the counts. The other note stated that the jury was having trouble with a juror who had made verbal threats and attacks, had acted in an intimidating manner, and had at times refused to deliberate. On that day the court interviewed several jurors and determined that juror Weyhing had written the latter note and that the other jurors had not seen it. The judge suspected that Williams was the juror referred to in the note, but he concluded that further investigation was necessary.

On the following morning the district judge read the *Allen* charge to the jury in response to the jury's reported deadlock. Still concerned about the reported threats in the jury room and considering the possibility of dismissing juror Williams for cause, the judge interviewed each jury member individually, in the presence of counsel, to solicit views regarding the accuracy of the note, which he read to each of them, the identity of the juror referred to, and the prospects for further impartial deliberations. Although each juror, including Williams, reported that Williams was the subject of the note, views were divided as to the seriousness of Williams's conduct. One juror indicated that juror Weyhing, the author of the note, was as much at fault as was Williams. Although one or two jurors thought continued deliberations would be difficult given the atmosphere of the jury room, the rest, including Williams and Weyhing, stated that they could continue to deliberate impartially, and one juror indicated that Williams was already beginning to cooperate.

After further discussion with counsel, the district court determined that there was not just cause to dismiss Williams and that the jury should be admonished to continue deliberations without personal threats. The court also agreed with Reed's counsel's suggestion that the matters raised by Williams should be addressed as well. Accordingly, the court made the following statement to the jury:

Just a couple of comments I want to make, members of the jury, before you return to continue your deliberations. First of all, your job here is to arrive at a decision based solely and completely upon the evidence you heard here in open court at the trial of the matter. Personal attacks, personal feelings have nothing to do with it. You must deliberate in a group of

twelve people on the evidence that you've heard and hopefully you'll come to a conclusion. It must be a group deliberation, all twelve participating. Further, it is not proper for you to take any evidence out of the jury room or take it home. All the deliberations must be among the twelve of you in your jury room.

J.A. at 1213–14.

Reed argues that this confluence of events singled Williams out as the problem and encouraged him to abandon his position. Reed argues that it was clear from the circumstances that Williams was the lone holdout juror, that the court recognized this fact, and that Williams knew that the court knew that Williams was the lone holdout. Thus, Reed argues, the *Allen* charge was effectively directed at Williams and was coercive.[6] Reed's position, however, is unfounded.

It was clear to all concerned that Williams was a source of conflict in the jury room. The district judge carefully avoided getting into the substance of the deliberations, however, and there was never any indication of the nature of the split in the jury, that is, whether the voting had deadlocked at eleven to one in one direction or the other, or six to six, or something in between, nor was there any indication as to Williams's position on any of the counts. Moreover, even if the court had inferred that Williams was a holdout, the judge's discussions with the individual jurors, including Williams, displayed no hint of such an assumption. These discussions focused solely on juror behavior and the ability of the jurors to deliberate impartially.

In this respect the present case is indistinguishable from *Frost.* There, although a juror had improperly brought materials into the jury room from outside and had justified this by stating that she felt outnumbered, this court held that a subsequent *Allen* charge was not an abuse of discretion, because the trial judge did not know whether the juror was a sole dissenter and the juror knew that the judge did not know.

Moreover, although it is coercive for the court to inquire into the numerical split in the jury, in cases in which this information has been voluntarily provided by the jury "and the instruction has not focussed on the minority, courts have generally upheld a supplemental charge." *United States v. Lash,* 937 F.2d 1077, 1085–86 (6th Cir.1991), *cert. denied,* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991), *and cert. denied,* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992). Thus, even if the judge had become aware of the numerical split, it was arguably within his discretion to give a properly worded *Allen* charge.

The court responded to the deadlock problem and the variety of juror misconduct claims as distinct issues. As to the first, the court gave a properly worded *Allen* charge. As to the latter, the court investigated the claims and gave an instruction that addressed the concerns of juror Weyhing as well as the concerns of juror Williams. Only the comment about personal attacks was directed at the charge leveled against Williams. The admonitions that the jury deliberate as a group of twelve and that no evidence be taken out of the room clearly responded to Williams's concerns. This was an even-handed instruction that appropriately responded to the misconduct allegations. Moreover, it appears that the instruction was effective as the jury deliberated several more days and reached a unanimous decision including both acquittals and a conviction on all but one of the counts. The district court was well within its discretion in deciding to interview the jurors individually on the misconduct question and in providing a supplemental instruction. *See Shackelford,* 777 F.2d at 1145. This investigative process and instruction did not render the earlier *Allen* charge coercive.

## C. Sufficiency of the Evidence

▇▇▇▇ Reed argues that the government's evidence was insufficient to sustain her conviction on the charge of conspiracy to commit money laundering because there was

---

**6.** Reed does not object to the wording of the *Allen* charge, but the accuracy of the language is not dispositive. *See Frost,* 125 F.3d at 375 (noting that "we traditionally have found an *Allen* charge coercive when the instructions themselves contained errors or omissions," but recognizing that "circumstances alone can render an *Allen* charge coercive").

no showing that Reed had an intent to promote continued drug trafficking. "We review the denial of a ... motion for judgment of acquittal due to insufficient evidence under the same standard as the district court." *See United States v. Beddow,* 957 F.2d 1330, 1334 (6th Cir.1992). The "[e]vidence is sufficient to support a criminal conviction if, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Id.* Circumstantial evidence alone is sufficient to support a conviction, and "[i]t is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Id.*

■■■ The federal money laundering statute makes it crime for anyone who

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity....

18 U.S.C. § 1956(a)(1)(A)(i).

Conviction is proper under § 1956(h) if Reed, in facilitating the cash transfers, acted "with the intent to promote the carrying on of specified unlawful activity."[7] The scope of this intent requirement, particularly in this circuit, however, is less than clear. Some circuits have held that the *receipt* of cash that is not shown to have been reinvested in illegal activity does not evidence the requisite intent. In *United States v. Jackson,* 935 F.2d 832, 840–41 (7th Cir.1991), the court held that checks written by the defendant that were covered by illegally derived funds satisfied the elements of § 1956(a)(1)(A)(i) only to the extent that the items purchased with those checks were shown to have been used in further illegal operations. Following *Jackson,* the court in *United States v. Heaps,* 39 F.3d 479, 484–86 (4th Cir.1994), held that a conviction under this subsection could not be based on the receipt of cash when the cash was simply held by the defendant.

Another line of cases has established the rule that, although the underlying crime may have been completed, transferring or cashing a *check* promotes the prior unlawful activity and satisfies the requirement of the statute. In *United States v. Paramo,* 998 F.2d 1212, 1217–18 (3d Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994), the court held that the act of cashing embezzled checks could promote the antecedent fraud even though the proceeds were spent on consumer items. This was so, the court held, because the defendant had testified that he believed the checks were worthless unless cashed. *See id.* at 1217. Similarly, in *United States v. Cavalier,* 17 F.3d 90, 93 (5th Cir.1994), the court held that the transfer of a check from an insurer to an automobile lienholder promoted the underlying fraud of filing a false insurance claim and satisfied the "intent to promote" requirement. In *United States v. Haun,* 90 F.3d 1096, 1100 (6th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 691, 136 L.Ed.2d 614 (1997), this court followed *Paramo* and *Cavalier* in holding that the cashing of checks fraudulently obtained promoted prior unlawful activity.

If we credit Reed's argument that she had no intent to promote future drug trafficking and that she was shown only to have been involved in the payment of an antecedent debt, her case falls between these two strands. Nonetheless, even under Reed's premise, the jury properly could conclude that Reed had the requisite "intent to promote." Reed was not the recipient of the cash transferred, and the cash was clearly used to pay a drug debt. Thus, the cases that hold that the use of the cash is dispositive suggest that the payor or transferor of cash settling an antecedent drug debt satisfies the statute. Just as the transfer of the check in *Cavalier* satisfied the automobile lien leaving the insurance fraud perpetrator

---

7. Reed, of course, was convicted only of conspiracy to commit money laundering pursuant to 18 U.S.C. § 1956(h) and not of the substantive offense. Thus, the government argues as an initial matter that it was not necessary to prove that Reed had an intent to promote further illegal activity as long as it was shown that other conspirators had that intent. Because we conclude that Reed was shown to have acted with the intent required under the substantive statute, we need not and do not reach this question.

free and clear (until he was caught), the payment of the drug debt satisfied a claim and eased the position of the payor. It seems irrelevant to the analysis of the court in *Cavalier*, as a matter of fact, that the payment from insurance company to lienholder was made by check.[8]

Even if an intent to repay an antecedent drug debt were insufficient to satisfy the "intent to promote" requirement of § 1956(a)(1)(A)(i), we would hold that the evidence was sufficient to convict. This is so because the evidence was sufficient for the jury to conclude, as the government argued, that Reed acted with the intent to facilitate the continuation of drug trafficking (rather than simply with the intent to facilitate the payment of an antecedent debt). It is undisputed that such an intent would satisfy § 1956(a)(1)(A)(i).

Reed was aware that Sumpter, the payee, intended to continue drug trafficking although he was incarcerated awaiting trial. Reed admits this, but she attempts to refute any finding of intent to promote that activity by pointing to testimony that established Reed's stated belief that Sumpter's plan would be "crazy." J.A. at 454. Nevertheless, knowing Sumpter's intent, Reed acted to facilitate the transactions. Given other evidence of Reed's involvement, a rational trier of fact could find beyond a reasonable doubt that Reed intended to promote further trafficking.

### D. Due Process and Ex Post Facto Challenges

■ Reed states that she "recognizes that this Court has already rejected her argument that her prosecution for money laundering was barred by the due process and *ex post facto* clauses," and that she raises the issues only for the purpose of preserving them for further review. Def.'s Br. at 48. The court in *United States v. Reed*, 77 F.3d 139 (6th Cir.) (en banc) (*"Reed I"*), *cert. denied*, 517 U.S. 1246, 116 S.Ct. 2504, 135

L.Ed.2d 194 (1996), did not reject the due process challenge, however. Rather, the court held that to raise a claim that prosecution based on the then-announced interpretation of the money laundering statute would violate due process, Reed would have to establish in the district court that she had relied on a case that was overruled by *Reed I*. *See id.* at 143. Apparently, however, Reed did not argue reliance on the overturned precedent below, and she does not do so before this court. Nor does she argue any alternative grounds for finding a constitutional violation. We consider this contention forfeited. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.) (noting the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

### E. Allegation of Grand Jury Misconduct

■ Reed argues that the money laundering charges specified in her original indictment ran counter to established circuit precedent. Her indictment on such charges, Reed argues, represents grand jury misconduct that triggers her constitutional right not to be tried. *See Midland Asphalt Corp. v. United States*, 489 U.S. 794, 802, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989). No defect of this significance arose, however, and the district court did not abuse its discretion in refusing to dismiss the final indictment. *See United States v. Breitkreutz*, 977 F.2d 214, 217 (6th Cir.1992) (noting abuse of discretion standard).

Reed was originally indicted on October 6, 1994 in the Third Superseding Indictment. At that time this court had held in *United States v. Samour*, 9 F.3d 531, 536 (6th Cir. 1993), "that merely transporting cash does not meet the definition of 'financial transaction' for purposes of the money laundering statute." Although that case involved the

---

**8.** As the government points out, this court upheld a conviction in *United States v. Baez*, 87 F.3d 805, 810–11 (6th Cir.), *cert. denied*, — U.S.——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996), which was factually similar to the present case. There, however, the court simply examined whether the factual basis for a guilty plea was sufficient, and the court focused on whether the delivery of cash constituted a financial transaction. If there was any objection based on a lack of intent, it was not mentioned.

transportation of cash followed by its delivery, the opinion did not discuss whether delivery alone could constitute a financial transaction. Thus, it was not unreasonable for the government to believe that it could successfully argue that the present transactions fell within the statute. *See also United States v. Oleson,* 44 F.3d 381, 387 (6th Cir.1995) ("Nowhere, however, did the *Samour* panel purport to hold that *delivery* of United States currency is not a 'transaction.'") (Nelson, J., concurring in the judgment).

Moreover, as the government notes, any defect in the Third Superseding Indictment is surely rendered moot by the fact that the money laundering counts under that indictment were dismissed and only reinstated after this court overruled *Samour* in *Reed I.*

### F. Downward Departure at Sentencing

■ Pursuant to U.S. SENTENCING GUIDE-LINES MANUAL ("U.S.S.G.") § 2S1.1 and other Guideline provisions, the district court determined that Reed's total offense level was thirty-two. The court granted Reed a downward departure reducing her sentence from the 121–month minimum applicable to offense level 32 to 46 months under offense level 23. The judge stated that Reed's "conduct was on the outer edges of that" contemplated by 18 U.S.C. § 1956, and he took into account the time and cost involved in the interlocutory appeal that determined that Reed's conduct was proscribed by 18 U.S.C. § 1956. J.A. at 1285–86. The court did not provide a basis for the extent of the departure granted. We conclude that the district court abused its discretion in granting this departure, and we remand for resentencing. *See Koon v. United States,* 518 U.S. 81, 97–98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (abuse of discretion standard); *United States v. Barajas–Nunez,* 91 F.3d 826, 835 (6th Cir.1996) (remand necessary where district court fails to provide basis for extent of departure).

The district court's assertion that Reed's conduct was outside of the heartland of the offense specified in § 1956 is unsupported. It appears that the district judge's first basis for departure rests on his view that it was a "close call" whether the delivery of cash could constitute money laundering under the statute. J.A. at 1285. Certainly the district court did not view Reed's conduct as typical money laundering. This court determined unanimously in *Reed I,* however, that, under the facts as alleged, Reed "would clearly have effected a disposition of the proceeds." *Reed I,* 77 F.3d at 143. Moreover, the decision in *Reed I* simply brought this circuit into line with the other circuits that had considered the question, *see id.,* and with the plain meaning of the statute. *See* 18 U.S.C. § 1956(c)(3) ("'transaction' includes a ... transfer, delivery, or other disposition"); § 1956(c)(4) ("'financial transaction' means (A) a transaction ... (i) involving the movement of funds by wire or other means").

Although holding Reed less culpable than the typical money launderer, the district court provided no specifics and offered no factors not contemplated by the Guidelines. As the government points out, the district judge specifically rejected Reed's contention that she be granted an adjustment for her minimal role in the conspiracy.

The length of the delay and the costs involved in resolving the interlocutory appeal in *Reed I* constituted an additional basis for the district court's departure. Delay, costs, and the toll that a delay takes on a defendant certainly may represent legitimate bases for a departure. *See Koon,* 518 U.S. at 112, 116 S.Ct. 2035. Neither the district judge nor Reed, however, has provided this court with any evidence that the length of the delay or the costs involved were unusual. The government argues that the delay was not lengthy for the processing of an interlocutory appeal, and the government suggests that the costs were not excessive. The government also notes that Reed has been free on bond during this entire process and remains free. Moreover, in addition to reducing Reed's sentence, the district court completely waived the Guideline fine of $17,500 to $500,-000. Unless there is evidence to the contrary, this waiver should be deemed to cover any additional costs incurred.

We remand this case for resentencing. In the interest of judicial efficiency and pursuant to 28 U.S.C. § 2106, we limit the scope of the remand. *See Super X Drugs Corp. v.*

*FDIC,* 862 F.2d 1252, 1256 (6th Cir.1988). In resentencing Reed, the district court should consider only whether a departure from its previously calculated total offense level of thirty-two is warranted, and, if so, to what extent departure is warranted.

In considering whether a downward departure is warranted, the district court should determine whether there exist mitigating factors "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." 18 U.S.C. § 3553(b); *see also* U.S.S.G. § 5K2.0; *Barajas–Nunez,* 91 F.3d at 832. If the district court determines on remand that a departure from the Guidelines is warranted, the court must provide the rationale underlying the extent of the departure selected so that, if required, we may provide meaningful review. *See Barajas–Nunez,* 91 F.3d at 835. Moreover, "[t]he extent of any departure must be tied to the structure of the Guidelines." *United States v. Crouse,* 145 F.3d 786, 792 (6th Cir.1998).[9]

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Reed's conviction, **VACATE** Reed's sentence, and **REMAND** the case for resentencing. As noted above, the mandate on remand is limited to a redetermination of whether and, if so, to what extent a departure from a Guideline sentence is warranted.

---

9. At oral argument Reed suggested that *United States v. Skinner,* 946 F.2d 176 (2d Cir.1991), may be relevant to the departure question. There, the court held that a downward departure from a Guideline sentence under the money laundering provision could be made in a case in which $3,320 had been transferred to pay drug debts. *See id.* at 179–80. At the time, the commentary to the relevant Guideline stated that "[a] higher base offense level is specified if the defendant is convicted under 18 U.S.C. § 1956(a)(1)(A) or (a)(2)(A) because those subsections apply to defendants who did not merely conceal a serious crime that had already taken place, but encouraged or facilitated the commission of further crimes." U.S.S.G. § 2S1.1 commentary, background (1990). A departure could be considered, the court held, because the appellants had not made the transaction to conceal a crime and because the promotion of further crimes was de minimis. *See Skinner,* 946 F.2d at 179. We note that the commentary to the Guidelines was amended in 1991 to delete the reference to concealing a crime. The revised commentary, *see* U.S.S.G. § 2S1.1 (1994), now reflects the distinction between the concealment prong of the money laundering statute, e.g., 18 U.S.C. § 1956(a)(1)(B), and the prong of the statute that deals with the promotion of unlawful activity, e.g., § 1956(a)(1)(A)(i). Thus, while the district court may consider whether and to what extent Reed facilitated further crime, concealment of past crime is not an issue in this sentencing determination.