**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bonnie MCCOY (No. 02–3625); Jesse A. Means (No. 02–3884), Defendants–Appellants.**

**Nos. 02–3625, 02–3884.**

United States Court of Appeals, Sixth Circuit.

Aug. 13, 2003.

Before: BATCHELDER and ROGERS, Circuit Judges; and RUSSELL, District Judge.*

### ORDER

These are two consolidated direct appeals from judgments and commitment orders in a criminal prosecution. The parties have waived oral argument and, upon examination, this panel unanimously agrees that oral argument is not needed. Fed. R.App. P. 34(a).

In 2002, Bonnie McCoy and Jesse A. Means were tried to a jury on drug conspiracy charges. The jury found McCoy guilty of conspiracy to distribute and posses with intent to distribute cocaine and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846. The jury also found Means guilty of the identical conspiracy count, although the reference to § 846 appears to have been inadvertently omitted from the judgment

and commitment order, as well as one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The district court sentenced McCoy to a sixty-three month term of imprisonment and a four year period of supervised release. The district court sentenced Means to an eighty-seven month term of imprisonment and a three year period of supervised release. McCoy's direct appeal, No. 02–3625, and Means's direct appeal, No. 02–3884, have been consolidated for disposition.

In December 2000, Miguel Santiago and Christopher Miles were working together in Alabama when they hatched a plot to obtain cocaine, take it to Miles's cousin in Cleveland, Ohio, and sell it. A co-worker introduced Santiago to Jose Ortuna, an Atlanta resident, who agreed to supply cocaine for the scheme. Miles learned of Ortuna's commitment and he proceeded to call, and then visit, his cousin in Cleveland with a sample of the cocaine. Miles's "Cleveland cousin" turned out to be Means. Miles and Means sought out the opinion of Andre Reese as to the quality of the cocaine and they inquired if Reese would be interested in purchasing any of the drug. This exchange of information took place at the residence of defendant Bonnie McCoy. Miles later made a telephone call to Santiago during which he mentioned that someone named "Bonnie" would be buying the cocaine. Miles returned to Alabama and made arrangements to pick up two kilograms of cocaine from Ortuna. Miles and Santiago drove Miles's truck to Atlanta to meet Ortuna and pick up the cocaine. The group hid the two kilograms of cocaine in the spare

* The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

tire of Miles's truck and they drove to Cleveland in the truck and another car.

The group arrived in Cleveland and drove directly to Means's house. Miles carried the spare tire of the truck into Means's residence where the two of them extricated the cocaine and repackaged it in Santiago's briefcase. Means began to call prospective buyers, including "Bonnie," but he was unable to locate her. The four men thereafter took a room at a nearby hotel where they cached the cocaine and made further attempts to locate buyers and arrange transactions. Means and Miles again went off to locate "Bonnie." This time their search was successful and they returned to the hotel to muster the other men and the cocaine. Means, Miles and Santiago gathered the cocaine and drove off in Miles's truck to the putative cocaine transaction.

Unbeknownst to the conspirators, the aforementioned Andre Reese was an occasional informant for a Euclid, Ohio, police officer in addition to being an authority on all things cocaine. Reese wasted little time in alerting the police to the impending cocaine sale following the meeting at McCoy's residence. Reese ultimately provided law enforcement officers with a description of Means and Miles, the physical description and license number of Miles's pickup truck, the name of the hotel, and the room number where the conspirators were staying. Reese also instigated telephone calls to McCoy, with police officers listening in, during which Reese negotiated a price for the cocaine and, finally, a time and place for the sale.

Police officers had the conspirators under surveillance when they left the hotel with the cocaine to consummate the putative drug sale. Officers followed Miles's pickup truck as it turned into a service station en route. At that time, the officers closed in and confronted the occupants of the truck, Miles and Santiago, and the driver, Means. The officers seized two brick-shaped objects covered in tinfoil on the seat that later turned out to be cocaine. Among the other items seized was an address book containing the telephone numbers of McCoy and Means. Other officers proceeded to the hotel room and arrested Ortuna in the room indicated by Reese.

Two police officers conducted the initial in-custody of Means. They testified at the suppression hearing under oath, without contradiction, that they first informed Means of his *Miranda* rights. Means said that he understood his rights but that he wished to continue the interview. The officers testified that Means executed a waiver of rights form (which they were unable to produce at trial) and they proceeded to take Means's statement. Means was said to have confirmed that Miles had been acting as the middleman for Santiago in the cocaine deal and that they were to deliver two kilograms of cocaine from their hotel room to a residence on the east side of Cleveland.

The preceding testimony was presented at trial against Means and McCoy. McCoy did not mount any defense, but Means took the stand to categorically deny any involvement in the conspiracy and to deny that he ever made the incriminating statements noted above. The jury found both parties guilty as charged and the court sentenced them to the punishments of record. Further details of the trial relevant to one defendant or the other will be discussed in the individual appeals below.

### No. 02–3625

■ Counsel for McCoy brings one issue for appellate review. Counsel maintains that the trial court erred in conducting ex parte communications with the jury,

while they were deliberating, and instructing the jurors that they had to decide the case immediately. An examination of the record and law shows that counsel waived the right to be present during the highlighted comments and that, in any event, it is impossible to characterize the comments as being improper.

The jury received this case on Friday, February 8, 2002, at 1:45 p.m. At that time, counsel for McCoy (and for co-defendant Means) waived the right to be present if the court had any communication with the jury. The conditions were that the court would take a court reporter into the jury room and transcribe any communications for later review of the parties. The jury had not reached a verdict when the court spoke with them at 4:03 p.m. The court inquired of the jury whether they wished to continue until 5:00 p.m., at which time they would be sent home for the weekend, or adjourn immediately. A brief dialogue ensued between the court and the jury as to the consequences of them continuing until 5:00 p.m. without having reached a verdict. The court repeatedly informed the jury that there was no pressure on them to decide anything that afternoon. At that point, one juror attempted to clarify the nature of the questions.

> A JUROR: I think we are actually making some progress to the point where we're starting to decide.
>
> THE COURT: I don't want to hear about your deliberations.
>
> A JUROR: And we prefer not to break it up because then Monday we have to start anew.
>
> THE COURT: Well, you have to decide, but I am just, simply put, an hour from now we are going to adjourn for the evening. So you want to stay for roughly another hour.
>
> A JUROR: Um-hum.
>
> THE COURT: Okay.

The jury returned the verdict of record shortly after the conclusion of this discussion.

Counsel for McCoy maintains that the court's phrase "you have to decide" was, in effect, a coercive charge to the jury that they had to make a decision on the guilt or innocence of McCoy at that time. The United States Attorney counters that the comment, taken in context, is merely a reflection that the court wished to leave to the jurors the option of continuing until 5:00 p.m. on that day or returning to continue their deliberations the following Monday.

The record and law support the position of the United States Attorney. When a jury informs a trial judge that it had reached an impasse, the judge may deliver a so-called *Allen* charge, named and modeled after a jury instruction approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The nature of the charge is to "exhort the jurors to continue their deliberations in an open-minded fashion." *United States v. Reed*, 167 F.3d 984, 989 (6th Cir.1999). To guard against the possibility that holdout jurors were improperly compelled to abandon their predisposition to vote to acquit a defendant, it is incumbent upon the appellate court to examine the totality of the circumstances in which the charge was given to determine whether the charge was coercive." *Id.* at 990.

In the case at bar, even assuming the error has been preserved, it is clear that the court's comments to the jury did not amount to an improperly coercive *Allen* charge. First, the jury did not indicate to the judge that it was deadlocked. The plain thrust of their questioning was: If we reach our decision in the next few minutes, do we have to come back Mon-

day? In addition, the transcript reflects the court's refusal to be drawn into any discussion of the substance of the deliberations. The court repeatedly told the jury that it would *not* force them to come to a decision. Finally, the court's "you have to decide" observation was patently in response to the question of how late the jury wanted to stay. An analysis of this issue under the totality of the circumstances shows that there is no reversible error in this appeal.

### No. 02–3884

Counsel for Means sets out three issues for appellate review. Means challenges the result of the suppression hearing, contends that the verdict was tainted by prosecutorial misconduct, and asserts that the verdict is not supported by a sufficient quantity of evidence. An examination of the record and law shows that none of these issues has any merit.

■ Counsel for Means first argues that the district court erred in not suppressing the incriminating statements made by Means in his initial interrogation. The chief basis for this claim is the inability of the prosecution to produce the actual waiver of rights form the agents testified that Means signed. Counsel also alludes to Means being illiterate and unaccustomed to the criminal process.

When reviewing a district court's decision on a motion to suppress, this court reviews its findings of fact for clear error and its conclusions of law de novo. *United States v. Miggins,* 302 F.3d 384, 393 (6th Cir.2002). Where, as here, a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was voluntary. The three requirements for a finding that a confession was involuntary due to police coercion are: 1) the police activity was objectively coercive; 2) the coercion in question was sufficient to overbear the defendant's will; and 3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir.1999) (citations omitted). There is no requirement that a written waiver of a defendant's *Miranda* rights (after *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) is necessary to prove that a defendant made a voluntary waiver of those rights. *Miggins,* 302 F.3d at 397.

This assigned error lacks merit. The uncontradicted evidence summarized above provided ample support for the district court's finding that Means had been given his *Miranda* rights, that he understood them, and that he voluntarily waived those rights in making the incriminating statements related by the two interrogating officers. Means's counsel even alluded to Means having been cooperative during his cross-examination of one of the officers. The absence of the written waiver was not legally fatal to this determination, and there is absolutely no evidence of the kind of police coercion listed in *Mahan* that would suggest that the confession was not voluntary.

■ The second issue is that the trial was marred by prosecutorial misconduct. The alleged misconduct was a line of questioning of Means and of comments made during closing argument. In general, a prosecutor's conduct must have been both improper and flagrant to warrant reversal of a conviction. *United States v. Tocco,* 200 F.3d 401, 420–21 (6th Cir.2000). This court "will not overturn a verdict unless the prosecutorial misconduct is 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, ... or so gross as probably to prejudice the defendant.'" *Id.* at 421 (quoting *Pritchett v.*

*Pitcher,* 117 F.3d 959, 964 (6th Cir.1997)). A review of the trial transcript, however, shows that defense counsel offered no contemporaneous objection to either of these actions. The absence of contemporaneous objections means that this court will review this claim only for "plain error." *United States v. Emuegbunam,* 268 F.3d 377, 406 (6th Cir.2001), *cert. denied,* 535 U.S. 977, 122 S.Ct. 1450, 152 L.Ed.2d 392 (2002). It therefore falls to this court to determine whether any obvious error occurred in the district court that affected Means's substantial rights or that "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.*

The issue lacks merit. The questioning of Means and the closing argument both were directed to the unalterable fact of Means's defense, namely, that if he was telling the truth about his total lack of involvement in the cocaine scheme, every prosecution witness was lying or mistaken. The questioning to this end is simply the prosecutor eliciting from Means this truism. The prosecutor's comment in closing argument is the same. There is no authority for the proposition that this line of questioning or argument, without objections, constitutes a miscarriage of justice and it would not otherwise appear.

■ Finally, counsel argues that the verdict is not supported by the evidence. This claim will fail if, "after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In applying this standard, this court does not "weigh the evidence presented, consider the credibility of witnesses, or substitute [our] judgment for that of the jury." *United States v. M/G Transport Services, Inc.,* 173 F.3d 584, 589 (6th Cir.1999).

This claim is meritless. The summary of the evidence set forth above, taken in the light most favoring the prosecution, shows that Means was a vital, willing, voluntary participant in a concerted effort to obtain and distribute two kilograms of cocaine in Cleveland, Ohio. This court cannot disturb his conviction on this ground merely on his naked denials in the face of the evidence. This appeal lacks merit.

Accordingly, the district court's judgments are affirmed.