In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-05-256 CR


____________________



RICHARD MATT SMELLEY, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the County Court at Law No. 2


Angelina County, Texas


Trial Cause No. 04-2046






MEMORANDUM OPINION


 Appellant Richard Matt Smelley was charged by complaint and information with
assaulting his mother-in-law, Wanda Forrest. See Tex. Pen. Code Ann. § 22.01(a) (Vernon
Supp. 2005). (1) A jury convicted Smelley, and the trial court assessed punishment at one year
of confinement, but suspended imposition of sentence and placed Smelley on community
supervision for one year. Smelley filed this appeal, in which he raises four issues for our
consideration. We affirm.

The Evidence


 Sergeant Jimmy Casper of the Angelina County Sheriff's Office testified that on
October 26, 2004, he was dispatched to a domestic disturbance. When he arrived, Deputy
Davey Hill was also on the scene. As Sergeant Casper approached the house, he saw people
fighting in the kitchen. He knocked on the front door, but no one answered, so he and
Deputy Hill forced their way into the house. Upon entering the residence, Sergeant Casper
saw Smelley and his father-in-law, Garvis Forrest, interlocked and grabbing each other. 
Sergeant Casper testified that Smelley appeared to be the aggressor. Sergeant Casper also
saw Wanda Forrest lying on the floor and Smelley's wife, Dana, standing nearby. Sergeant
Casper did not see how Wanda came to be on the floor. Smelley did not stand down when
the officers entered, so they forced Smelley to the ground and handcuffed him. Sergeant
Casper described Smelley as upset and uncooperative.

 Sergeant Casper testified that Dana told him she went to the house to talk to her son,
G.S. G.S. was in the office with Smelley, and Smelley attempted to prevent Dana from
talking to G.S. Dana related that Smelley slammed the office door, hitting her in the chest,
causing her to fall into the wall and injuring her. Wanda told Sergeant Casper that Dana had
asked her to help get the children out of the house, and when Wanda and her husband Garvis
arrived, they saw Dana and Smelley arguing heatedly, so they entered the residence. 

 When Wanda and Garvis entered, Smelley pushed Wanda. Garvis intervened, and
Smelley pushed him. Wanda related that Smelley again pushed her, causing her to fall to the
floor. Wanda complained that her chest, tailbone, and right arm hurt, and Sergeant Casper
noticed red marks around her neck. Garvis told Sergeant Casper that Dana and Smelley were
arguing, and Smelley had yelled and pushed Wanda. Smelley then pushed Garvis, causing
him to fall. Sergeant Casper observed red marks around Garvis's neck. Sergeant Casper
charged Smelley with assault-family violence against Dana and Class A assault against
Wanda Forrest.

 Deputy Davey Hill of the Angelina County Sheriff's Office testified that he
encountered Smelley on October 26, 2004, while responding to a domestic disturbance. As
Deputy Hill approached the residence, he looked through the window and saw Smelley and
a female arguing. Deputy Hill knocked on the front door and identified himself, but no one
answered. Deputy Hill heard a "loud ruckus," so he went to the kitchen window and saw
Smelley and an elderly gentleman "tussling around[.]" Deputy Hill again knocked on the
door, but no one opened it. The "ruckus" grew louder, so Sergeant Casper kicked the door
in and the officers entered the residence. Deputy Hill saw an elderly female lying partially
underneath the kitchen table, and he noted that "chairs [were] scattered as though she had
been thrown to the floor." Smelley was irate when the officers entered the house, so they
restrained him and placed him in Deputy Hill's patrol car. Deputy Hill believed Smelley was
the primary aggressor.

 Wanda testified that Dana filed for divorce in October of 2004. However, Dana and
Smelley were both still living at home with their children. On the evening of October 26,
Dana called Wanda and asked Wanda to come and help her get the children out of the house. 
Dana "was crying and her voice was trembling[.]" Wanda called 911 at Dana's request. 
Wanda and Garvis proceeded to Dana's house, and they saw Smelley in Dana's face,
screaming at her.

 Wanda became concerned for Dana's safety, so she and Garvis entered the house
without knocking. Wanda tried to check on the children, and Smelley lunged at her and
shouted. Wanda testified she told Smelley, "We are gonna check on the kids--get the kids. 
We're going to get the kids." Smelley continued shouting at Wanda, and he shoved her to
the floor. Wanda testified it hurt when Smelley pushed her to the floor, and she went to the
hospital a few days later because she was "still hurting quite bad." Wanda testified that the
fall injured her elbow and tailbone.

 Garvis testified that Wanda received a phone call from Dana on October 26. As a
result of that telephone call, Wanda called the sheriff's office, and Garvis and Wanda went
to Dana's house to help her get the children out of the house. When Garvis and Wanda
arrived, they saw a deputy's car at the front door. Garvis and Wanda saw Smelley shouting
at Dana, and they went into the house. Garvis testified that Smelley came "running over
there hollering for us to leave and whenever he ran up to my wife, he started to push her and
she [threw] her hands up and then he got back and shoved her harder the second time and she
fell over backwards on her back." Garvis picked up a chair, and Smelley yelled, "Get out of
the house" and began shoving Garvis. Smelley threatened to hit Garvis, and the deputy
entered and prevented Smelley from hitting Garvis. Garvis testified that neither he nor
Wanda was aggressive to Smelley when they entered the house.

 Dana testified that although she had filed for divorce, she was living with Smelley on
October 26, 2004. On that date, when Wanda arrived home after work, her son G.S. was
upset because he did not have his homework. Dana found G.S. in the home office with
Smelley, and she went to the door to talk to G.S. Dana testified that Smelley yelled at her
to get out, and Smelley slammed the door against Dana's body, knocking her into the wall
behind her. Dana called Wanda because Smelley had told her she could not take the children
anywhere. Dana told Wanda, "I need help because he's not going to let the kids leave and
I'm not leaving without them." Dana then began packing clothes for the kids and herself.
According to Dana, Smelley came out of the office, asked her what she was doing, and said,
"You're not taking them. You are not taking the kids." Dana told Smelley she intended to
take the children, and they began to argue in the kitchen.

 According to Dana, Garvis and Wanda entered through the back door. Dana stated
that Wanda and Garvis "didn't get but maybe 10 feet inside before the assault occurred."
Smelley told Wanda and Garvis twice to "get out," and he "charged" at Wanda the second
time he said it. Dana saw Smelley assault Wanda by pushing her to the floor. Dana testified
that Wanda and Garvis were not aggressive toward Smelley. After Wanda fell, Garvis tried
to protect Wanda, and Smelley knocked Garvis down. Smelley again moved toward Wanda,
and Garvis picked up a chair. The officers entered at that point and restrained Smelley.

 Dana's divorce attorney advised her to record some of the events occurring in her
house. She testified that the audiotape admitted as State's Exhibit No. 2 was an accurate
copy of the recording she made of the events of October 26. The State played the audiotape
at trial. Dana also testified that since the incident, she received harassing telephone calls
from Smelley, and she filed a report with the sheriff's office. The State rested at the
conclusion of Dana's testimony.

 Smelley testified that Dana filed for divorce on October 8, 2004. Smelley testified
that as of October 26, he and Dana had not been to court and the court had not entered any
orders. Smelley and Dana were both still living with the children. On October 25, when
Smelley arrived at school to pick up the children, they were not there. Smelley called Dana
and asked her where she and the kids were, but she did not tell him. Smelley did not see
them that night, and so he contacted the sheriff's office.

 On October 26, when Dana arrived home, Smelley was in the home office. Dana
walked in and said, "[G.S.], come here." Because Dana had recently taken the kids, Smelley
told her twice to leave. Dana moved as though she intended to leave the doorway, and
Smelley slammed the door. When he walked out of the office, Smelley saw Dana standing
beside the back door with the children's bags.

 Smelley testified that he and Dana were arguing when Garvis and Wanda entered the
house. Smelley did not know that Garvis and Wanda had Dana's permission to be there. 
Smelley testified, "I moved . . . to back up from Dana because when I looked at the looks on
their face, they weren't carrying cookies and milk to come over and celebrate." Smelley
ordered Garvis and Wanda to leave at least three times. Smelley testified, "I looked at the
looks on their face and it took me completely by surprise, why they would be coming in my
house at the time Dana and I were having an argument . . . and then I said, 'Leave,' just like
that."

 Garvis and Wanda continued coming toward Smelley, and Wanda said, "No, I'm not
leaving." Smelley grabbed Wanda and Garvis by their clothing and marched them towards
the door. Smelley testified, "At some point, I saw Wanda laying there on the ground
screaming." Smelley denied striking Wanda or Garvis, and he testified he was trying to get
them out of the house. Smelley testified that he acted in defense of himself and his children. 
Smelley also denied charging at Wanda or Garvis.

Smelley's First Issue


 In his first issue, Smelley argues the trial court erred in denying his requested jury
instruction of "justified force to prevent an unlawful taking of his children[.]" Smelley
requested the following instruction:

 A parent in lawful possession of children is justified in using force against
another when and to the degree the parent reasonably believes the force is
immediately necessary to prevent or terminate another person from unlawfully
interfering with taking his children. 


The trial court ruled as follows: "With the absence of any authority or statute or law to
present with that request, I'm going to deny that request."

 On appeal, Smelley asserts that his requested instruction is a combination of the
defenses of necessity, justification, self defense, threats as justifiable force, public duty,
defense of third person, and protection of one's property. (2) See Tex. Pen. Code Ann. §§
9.02, 9.04, 9.21, 9.22, 9.31, 9.33, 9.41 (Vernon 2003). "[B]ecause the authority to establish
what constitutes a defense rests solely with the Legislature, . . . a defense which is not
recognized by the Legislature as either a defense or as an affirmative defense does not
warrant a separate instruction." Giesberg v. State, 984 S.W.2d 245, 250 (Tex. Crim. App.
1998) (citing Sanders v. State, 707 S.W.2d 78, 80-81 (Tex. Crim. App. 1986)). Smelley
presents no statutory authority supporting the inclusion of his requested "combination"
instruction regarding a parent's justified use of force to prevent an unlawful taking of his
children. Accordingly, we overrule issue one. 

Smelley's Second Issue


 In his second issue, Smelley contends the trial court "erred in adding a family violence
finding to the judgment." The State charged Smelley with assaulting both Dana and Wanda,
and the trial court consolidated the two cases for trial pursuant to the parties' agreement. In
trial cause number 04-2046, pertaining to Wanda Forrest, the State charged Smelley with
assault. In trial cause number 04-2050, the case pertaining to Dana Smelley, the State
charged Smelley with "assault-family violence." Smelley asserts the State did not give him
notice that it would seek a family violence finding in the instant case (trial cause number 04-2046). Specifically, Smelley contends the trial court "erred by allowing a family violence
finding without the finding being ple[]d by the State, defined in the court's charge, submitted
to the jury and a verdict beyond a reasonable doubt that the facts supported . . . Assault -
Family Violence." Smelley further argues that because the finding affects his constitutional
right to bear firearms, requires special conditions of probation and counseling, and subjects
him to the possibility of increased punishment in the future, his rights to due process were
violated by allowing the State to obtain the finding without pleading it. Finally, Smelley
maintains that the trial court's determination of family violence without a jury finding
violates the U.S. Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120
S.Ct. 2348, 147 L.Ed.2d 435 (2000).

 Article 42.013 of the Texas Code of Criminal Procedure provides that if the trial court
determines the offense involved "family violence" as defined by section 71.004 of the Texas
Family Code, the court "shall make an affirmative finding of that fact and enter the
affirmative finding in the judgment. . . ." Tex. Code Crim. Proc. Ann. art. 42.013 (Vernon 
Supp. 2005); see Tex. Fam. Code Ann. § 71.004 (Vernon 2002). "Family Violence" is
defined as:

 an act by a member of a family or household against another member
of the family or household that is intended to result in physical harm, bodily
injury, assault, or sexual assault or that is a threat that reasonably places the
member in fear of imminent physical harm, bodily injury, assault, or sexual
assault, but does not include defensive measures to protect oneself.


Tex. Fam. Code Ann. § 71.004(1) (Vernon 2002). "'Family' includes individuals related
by consanguinity or affinity, as determined under Sections 573.022 and 573.024,
Government Code. . . ." Tex. Fam. Code Ann. § 71.003 (Vernon 2002). Individuals are
related by consanguinity if one is a descendant of the other or they share a common ancestor. 
Tex. Gov't Code Ann. § 573.022 (Vernon 2004). Two individuals are related by affinity
if they are married to each other or the spouse of one of the individuals is related by
consanguinity to the other individual. Tex. Gov't Code Ann. § 573.024 (Vernon 2004). 
Because Smelley and Dana were married, and Dana was related by consanguinity to Wanda,
Smelley was related to Wanda by affinity. See Tex. Fam. Code Ann. § 71.003; Tex. Gov't
Code Ann. §§ 573.022, 573.024. Both offenses involved family violence, and the trial court
was required to enter an affirmative finding of family violence in the event of a conviction. 
See Tex. Fam. Code Ann. § 71.004(1); Tex. Code Crim. Proc. Ann. art. 42.013; Thomas
v. State, 150 S.W.3d 887, 888 (Tex. App.--Dallas 2004, pet. ref'd). 

 In rejecting the due process argument, the Thomas court noted, "[a] finding of family
violence impacts a defendant's sentence only if the defendant has previously committed a
family-violence assault." Thomas, 150 S.W.3d at 888; see also Tex. Pen. Code Ann. §
22.01(b)(2) (Vernon 2003) (Assault is a Class A misdemeanor, but it becomes a third-degree
felony if it is committed against a member of the defendant's household and the defendant
has previously been convicted of assault against a family member.). Here, the State did not
allege Smelley had previously been convicted of an assault against a family member. Under
the Thomas court's interpretation, the family violence finding did not impact Smelley's
punishment. See Tex. Pen. Code Ann. § 22.01(b)(2). In addition, the information filed by
the State alleged Smelley assaulted Wanda Forrest, whom the record shows Smelley knew
to be his mother-in-law. Article 42.013 of the Texas Code of Criminal Procedure requires
the trial court to enter a family violence finding if it determines the offense involved family
violence. See Tex. Code Crim. Proc. Ann. art. 42.013; Thomas, 150 S.W.3d at 889. 
Hence, Smelley had adequate notice that the State would seek a family violence finding. See
Tex. Code Crim. Proc. Ann. art. 42.013; Thomas, 150 S.W.3d at 889. 

 [E]ven if the information did not formally inform appellant that the
State would seek a family violence finding, he could not have been harmed by
the alleged failure. Because he could not avoid the legal reality of his familial
relationship. . ., a more formal notice from the State would not have changed
the outcome of appellant's case. Any error was harmless. See Tex. R. App.
P. 44.2(a).


Thomas, 150 S.W.3d at 889.

 Smelley is correct in his assertion that, because a family violence conviction adversely
affects his Second Amendment rights under the United States Constitution, due process is
implicated. However, the Texas Court of Criminal Appeals has already addressed this issue. 
In Butler v. State, 189 S.W.3d 299, 303 (Tex. Crim. App. 2006), the court held that Apprendi
does not apply to a family violence finding. The court reasoned that none of the community
supervision conditions increased the defendant's punishment. (3) See id. As in Butler, the
family violence finding does not increase Smelley's punishment exposure. We overrule issue
two.



Smelley's Third Issue


 In issue three, Smelley asserts the evidence is factually insufficient to sustain his
conviction. In Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004), the Court
of Criminal Appeals phrased the standard for a factual sufficiency review as follows: 

 Considering all of the evidence in a neutral light, was a jury rationally justified
in finding guilt beyond a reasonable doubt? However, there are two ways in
which the evidence may be insufficient. First, when considered by itself,
evidence supporting the verdict may be too weak to support the finding of guilt
beyond a reasonable doubt. Second, there may be both evidence supporting
the verdict and evidence contrary to the verdict. Weighing all the evidence
under this balancing scale, the contrary evidence may be strong enough that
the beyond-a-reasonable-doubt standard could not have been met, so the guilty
verdict should not stand. This standard acknowledges that evidence of guilt
can "preponderate" in favor of conviction but still be insufficient to prove the
elements of the crime beyond a reasonable doubt. Stated another way,
evidence supporting guilt can "outweigh" the contrary proof and still be
factually insufficient under a beyond-a-reasonable-doubt standard.


Zuniga, 144 S.W.3d at 484-85. An appellate court "must give due deference to the fact
finder's determinations concerning the weight and credibility of the evidence. . . ." 
Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003). It is the sole province of
the jury to determine the credibility of witnesses and to weigh contradictory testimony. Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979).

 Wanda testified that Smelley shoved her to the floor. Garvis and Dana both testified
that Smelley pushed Wanda to the floor. Sergeant Casper testified that when he arrived on
the scene, Wanda was lying on the floor. Deputy Hill testified that chairs in the kitchen were
scattered as though Wanda had been thrown to the floor. Smelley testified that he grabbed
Wanda by her clothing and marched her toward the door, and "[a]t some point, [he] saw
Wanda laying there on the ground screaming." Wanda testified that her elbow and tailbone
hurt, and she sought medical treatment a few days after the incident. Wanda also reported
her pain to Sergeant Casper, and he saw red marks around her neck. Viewing the evidence
in a neutral light, the evidence supporting the verdict is not too weak, nor is the contrary
evidence so strong that the burden of proof could not be met. See Zuniga, 144 S.W.3d at
484-85. The evidence is factually sufficient to support the verdict. We overrule Smelley's
third issue.

Smelley's Fourth Issue


 In issue four, Smelley argues the trial court "erred in giving the jury an Allen (4)
instruction and allowing the jury to change its verdict after a 'Not Guilty' finding was read
in open court." After deliberations began, the jury sent a note to the Court stating that they
were unable to reach a verdict in cause number 04-2050, the case involving the alleged
assault on Dana. The jury returned to the courtroom, and the trial court gave the following
instruction:


 If this jury finds itself unable to arrive at a unanimous verdict, and this
is in 04-2050 only, it will be necessary for the Court to declare a mistrial and
discharge the jury. The Information [sic] will still be pending and it is
reasonable to assume that the case will be tried again before another jury at
some future time. Any such future jury will be empanelled [sic] in the same
way this jury has been empanelled [sic] and will likely hear the same evidence
which has been presented to this jury. The questions to be determined by that
jury will be the same questions confronting you and there is no reason to hope
the next jury will find these questions any easier to decide than you have found
them.


 With this additional instruction, you are requested to continue
deliberations in an effort to arrive at a verdict that is acceptable to all members
of the jury, if you can do so without doing violence to your conscience. Don't
do violence to your conscience, but continue deliberating. Okay?


When the jury returned to the courtroom, the trial court read the verdict aloud. The trial
court read, "We, the jury, find the Defendant, Richard Matt Smelley, not guilty of assault
against Wanda Forrest."

 The presiding juror informed the trial court that the jury was unable to reach a verdict
in cause number 04-2050. The trial court began declaring a mistrial in cause number 04-2050, and the presiding juror interrupted and informed the trial court that the jury "may have
made a mistake" in cause number 04-2046. The Court recessed the proceedings and talked
to the jury. The trial court informed the parties that the jury foreman "says that he signed the
verdict form on the wrong line and didn't realize it until after I had read it[.]" The trial court
returned the verdict form to the jury without any instructions and allowed the jury to
deliberate. The jury returned a verdict of guilty in cause number 04-2046. The trial court
then polled each member of the jury, and each juror indicated that "guilty" was his or her
verdict.

 Smelley argues that submitting the Allen charge caused the jury to render an improper
verdict because "[t]he jury rendered a 'not guilty' verdict first." This is not persuasive. The
trial court explicitly limited the Allen instruction to the case involving Dana Smelley. No
verdict was reached in that case, and the Allen charge was not relied upon by the jury to
reach a verdict in either case. 

 Smelley asserts that "[o]nce a verdict is read in open court, the verdict should have
been accepted and the jury should not have been allowed to change their answer." Article
37.04 of the Texas Code of Criminal Procedure provides as follows:

 When the jury agrees upon a verdict, it shall be brought into court by
the proper officer; and if it states that it has agreed, the verdict shall be read
aloud by the judge, the foreman, or the clerk. If in proper form and no juror
dissents therefrom, and neither party requests a poll of the jury, the verdict
shall be entered upon the minutes of the court.


Tex. Code Crim. Proc. Ann. art. 37.04 (Vernon 1981). Article 37.05 of the Texas Code of
Criminal Procedure provides:

 The State or the defendant shall have the right to have the jury polled,
which is done by calling separately the name of each juror and asking him if
the verdict is his. If all, when asked, answer in the affirmative, the verdict
shall be entered upon the minutes; but if any juror answer in the negative, the
jury shall retire again to consider its verdict.


Tex. Code Crim. Proc. Ann. art. 37.05 (Vernon 1981). When the trial court read the
verdict, the jury foreman realized he had completed the form incorrectly and so informed the
court. The procedure followed by the trial court comported with the requirements of articles
37.04 and 37.05 of the Texas Code of Criminal Procedure. See Tex. Code Crim. Proc.
Ann. arts. 37.04, 37.05. Smelley cites no authorities in support of his contention to the
contrary. See Tex. R. App. P. 38.1. We overrule issue four and affirm the trial court's
judgment.

 AFFIRMED.


 

 STEVE McKEITHEN

 Chief Justice


Submitted on May 25, 2006

Opinion Delivered July 26, 2006

Do Not Publish


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Because this section has not substantively changed since its enactment, we cite the
current version.
2. The trial court included instructions regarding self defense and defense of property
in the charge. Smelley does not appeal the denial of separate instructions on necessity,
justification, threats as justifiable force, public duty, or defense of a third person. Rather, he
appeals only the denial of his proposed combination instruction.
3. It is difficult to see how a conviction that eliminates a defendant's Second
Amendment right does not increase his punishment. However, we defer to the Court of
Criminal Appeals on this issue.
4. See Allen v. U.S., 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).