NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0347-15T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

ISAIH GORDON,

 Defendant-Appellant.

_______________________________

 Submitted October 17, 2017 – Decided October 27, 2017

 Before Judges Fasciale and Moynihan.

 On appeal from Superior Court of New Jersey,
 Law Division, Essex County, Indictment No.
 13-11-2914.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Michele E. Friedman, Assistant
 Deputy Public Defender, of counsel and on the
 briefs).

 Robert D. Laurino, Acting Essex County
 Prosecutor, attorney for respondent (Barbara
 A. Rosenkrans, Special Deputy Attorney
 General/Acting Assistant Prosecutor, of
 counsel and on the briefs).

PER CURIAM
 Defendant appeals from his convictions for second-degree

unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); fourth-

degree possession of hollow-point bullets, N.J.S.A. 2C:39-3(f);

and fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a). We

conclude that the failure to qualify two witnesses as experts,

give an expert witness charge, and properly charge the jury after

they were deadlocked resulted in plain error. We therefore reverse

and remand for a new trial.

 At trial, the State produced lay testimony from Officer Edward

Pearce and Officer Bao Ho. The State offered expert opinion

testimony from Detective Robert Harris and Detective Kimiiko

Woods. Although it is clear that they rendered expert opinion

testimony in the field of fingerprint analysis and firearm

ballistics, the assistant prosecutor did not offer them as experts,

and the judge did not give an expert witness charge as to either

one. Defendant did not testify, but called his girlfriend as a

witness.

 Officer Pearce testified that he noticed two males conversing

in a parking lot. He observed one of them, not defendant, place

what appeared to be drugs into his pocket. The officer exited his

police vehicle, approached the two individuals, and saw "the handle

of a handgun" in defendant's waistband. Defendant ran away from

the officer, who pursued him on foot. During the chase, the

 2 A-0347-15T1
officer spotted the gun drop to the ground as defendant approached

a fence.

 Officer Ho testified that he saw defendant "sprint" from

Officer Pearce. Officer Ho exited his police car, joined the foot

chase, and searched for a gun after he heard Officer Pearce yell

"gun." He found a gun on the ground. Officer Ho testified that

he waited "a half an hour or more" for another officer to provide

a camera, and then he photographed the gun before touching it.

 Detective Harris testified as an employee in the crime-scene

unit of the prosecutor's office. On direct examination, and after

the assistant prosecutor established his professional credentials

and extensive experience, especially as to his "fingerprint

career," the detective explained that he tested the gun for

fingerprints. After explaining how that was done, he testified

that his examination of the gun showed no fingerprints.

 Detective Harris opined that there is a low probability of

lifting fingerprints off weapons because of a variety of reasons,

such as the design of the weapon and the weather. The detective

opined that the gun found at the scene had no fingerprints because

the handle was plastic. According to the detective, the plastic

handle amounted to an "alligator-type surface," which in his

opinion was "made to grip and not to actually leave a fingerprint."

 3 A-0347-15T1
 Detective Woods worked for the police department as a

ballistics firearms examiner. On direct examination, she

testified that she generally conducts "operability tests on

handguns," and "performs microscopic examinations of bullets and

casings that are recovered from the shooting scenes." Detective

Woods tested the gun the police retrieved from the scene and

concluded it was operable. She opined further that ten bullets

accompanying the gun were "hollow[-]point [bullets]." The

detective explained that hollow-point bullets "enter a target and

mushroom open causing it to stop upon impact."

 The girlfriend testified that defendant was at her home after

she attended church. According to the girlfriend, defendant then

left her house to get food. She testified that he did not have a

gun when he left her house.

 At sentencing, the State moved for a discretionary extended

prison term. After denying that motion, the judge sentenced

defendant to an aggregate prison term of eight years, with four

years of parole ineligibility.

 On appeal, defendant raises the following arguments:

 POINT I
 THE [JUDGE'S] FAILURE TO PROVIDE THE JURY WITH
 AN EXPERT JURY INSTRUCTION WITH RESPECT TO
 DETECTIVES HARRIS AND WOODS REQUIRES REVERSAL.
 (Not Raised Below)[.]

 4 A-0347-15T1
 A. The Opinion Testimony of Detectives Harris
 and Woods Required Specialized Knowledge
 Beyond the Ken of the Average Juror.

 B. The Absence of an Expert Jury Instruction
 Had the Clear Capacity to Distort the Jury's
 Deliberative Process.

 POINT II
 [DEFENDANT] WAS DEPRIVED EFFECTIVE ASSISTANCE
 OF COUNSEL BECAUSE HIS ATTORNEY DID NOT RAISE
 THE GUN-AMNESTY STATUTE ON HIS BEHALF. (Not
 Raised Below)[.]

 A. []L. 2013, c. 117 Created a 180-Day Amnesty
 Period for Gun Possession.

 B. Defendant's Trial Attorney Rendered
 Ineffective Assistance of Counsel by Failing
 to Raise a Gun-Amnesty Defense.

 POINT III
 THE [JUDGE'S] COERCIVE INSTRUCTION TO CONTINUE
 DELIBERATIONS AFTER THE JURY INDICATED THAT
 IT WAS AT AN IMPASSE ON TWO COUNTS DENIED THE
 DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL.
 (Not Raised Below)[.]

 POINT IV
 THE MATTER SHOULD BE REMANDED FOR RESENTENCING
 BECAUSE THE SENTENCE IMPOSED BY THE [JUDGE]
 IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE.

We review defendant's first three arguments for plain error because

defense counsel did not raise objections. Under this deferential

standard, we disregard any error or omission "unless it is of such

a nature as to have been clearly capable of producing an unjust

result." R. 2:10-2.

 5 A-0347-15T1
 We begin with defendant's argument that the judge failed to

give the appropriate expert witness charge as to Detectives Harris

and Woods. We conclude that the failure to give this charge

prevented the jury from placing these witnesses' testimony into

proper context. See Model Jury Charge (Criminal), "Expert

Testimony" (2003) (requiring the judge to identify to the jury

each testifying expert and such expert's area of expertise). Under

the circumstances of this case, such an error is clearly capable

of producing an unjust result.

 Lay opinion testimony is governed by N.J.R.E. 701, which

permits lay witness "testimony in the form of opinions or

inferences . . . if it (a) is rationally based on the perception

of the witness and (b) will assist in understanding the witness'

testimony or in determining a fact in issue." Detectives Harris

and Woods did not render lay opinions. Rather, the State elicited

expert opinion testimony from them.

 An expert witness may testify in the form of an opinion

provided it "will assist the trier of fact to understand the

evidence or to determine a fact in issue." N.J.R.E. 702. To be

admissible, expert testimony must be about a "subject that is

beyond the understanding of the average person of ordinary

experience, education, and knowledge." State v. Odom, 116 N.J.

65, 71 (1989). The testimony from the detectives concerned

 6 A-0347-15T1
subjects that are beyond the ordinary intelligence of an average

person. The State concedes this point.

 On direct examination, the assistant prosecutor elicited

testimony demonstrating that the detectives were qualified as

experts. Although it is undisputed that the detectives rendered

expert opinion testimony, the State failed to offer the witnesses

as experts. The judge did not qualify them as experts before the

witnesses provided their opinions.

 Detective Harris testified that he has experience processing

crime scene evidence; investigating crimes; performing forensic

analysis; looking for fingerprints; and swabbing for DNA evidence.

He explained that he started his law enforcement career in 1994,

and started his fingerprint career in 1996. The detective stated

that he received training on how to extract fingerprints, including

reading literature, and attending symposiums and lectures; and he

has fingerprinted thousands of guns, including shell casings,

magazines, and bullets.

 Detective Woods testified about her experience in processing

ballistic evidence for the police. She explained that the police

generally transport to her guns, casings, and bullets seized during

the commission of a crime and she performs various testing in the

ballistic lab. The detective stated she tests weapons and

determines whether they are operable, she measures bullets by

 7 A-0347-15T1
looking at the "lands and grooves," which provide a bullet's unique

identification, and determines whether bullets are hollow-point.

 The failure to qualify the detectives as experts in the field

of fingerprint analysis and ballistics firearm examinations, and

then give the appropriate jury charge, deprived the jury of fully

understanding how to consider their opinion testimony. The

required model jury charge on expert opinion testimony states in

part that

 witnesses can testify only as to facts known
 by them. This rule ordinarily does not permit
 the opinion of a witness to be received as
 evidence. However, an exception to this rule
 exists in the case of an expert witness who
 may give (his/her) opinion as to any matter
 in which (he/she) is versed which is material
 to the case. In legal terminology, an expert
 witness is a witness who has some special
 knowledge, skill, experience or training that
 is not possessed by the ordinary juror and who
 thus may be able to provide assistance to the
 jury in understanding the evidence presented
 and determine the facts in this case.

 . . . .

 You are not bound by such expert's opinion,
 but you should consider each opinion and give
 it the weight to which you deem it is entitled,
 whether that be great or slight, or you may
 reject it. In examining each opinion, you may
 consider the reasons given for it, if any, and
 you may also consider the qualifications and
 credibility of the expert.

 It is always within the special function of
 the jury to determine whether the facts on
 which the answer or testimony of an expert is

 8 A-0347-15T1
 based actually exist. The value or weight of
 the opinion of the expert is dependent upon,
 and is no stronger than, the facts on which
 it is based. In other words, the probative
 value of the opinion will depend upon whether
 from all of the evidence in the case, you find
 that those facts are true. You may, in fact,
 determine from the evidence in the case that
 the facts that form the basis of the opinion
 are true, are not true, or are true in part
 only, and, in light of such findings, you
 should decide what affect such determination
 has upon the weight to be given to the opinion
 of the expert. Your acceptance or rejection
 of the expert opinion will depend, therefore,
 to some extent on your findings as to the truth
 of the facts relied upon.

 The ultimate determination of whether or not
 the State has proven defendant's guilt beyond
 a reasonable doubt is to be made only by the
 jury.

 [Model Jury Charge (Criminal), "Expert
 Testimony" (2003).]

 We reject the State's argument that the failure to give the

expert jury charge did not deprive defendant of a fair trial. The

State asserts that defense counsel defended the weapons charges

by arguing defendant had never seen the gun. According to the

State, the lack of fingerprints on the gun compliments defendant's

defense theory. In other words, the State asserts it is irrelevant

whether fingerprints were capable of residing on the plastic handle

of the gun. Defendant's girlfriend maintained that defendant left

her house without a gun. The jury could accept or reject that

testimony. If they rejected it, then whether fingerprints were

 9 A-0347-15T1
on the plastic handle would be probative on the State's charge

that defendant unlawfully possessed the weapon. The detective

provided an expert reason for why fingerprints on the gun handle

were unlikely, but the jury did not know that they could reject

that testimony outright.

 Defendant's purported theory of the case, therefore, does not

obviate the requirement for properly offering the witnesses as

experts, qualifying them as such, and instructing the jury on how

to consider their opinion, especially as to Detective Wood's

testimony on the operability of the weapon and hollow-point

bullets. Certainly, without expert testimony, the jury was unable

to comprehend what hollow-point bullets were.

 We conclude that the failure to qualify and offer the

detectives as expert witnesses, and the jury's ignorance about the

role of forensic experts, how to consider expert testimony, and

their ability to reject the detectives' expert opinion testimony,

is clearly capable of producing an unjust result and therefore

deprived defendant of a fair trial. The judge exacerbated this

plain error when he coercively directed the jury to deliberate

after the jury reported it was deadlocked on two of the charges.

 After deliberating for two hours on the first day, and the

entire second day until 5:00 p.m., the jury asked the judge if it

could continue deliberating for two additional hours. Some of the

 10 A-0347-15T1
jurors were unable to return the next day, and apparently wanted

to continue deliberating that night. The judge granted that

request without objection.

 At approximately 7:07 p.m. that night, the jury notified the

judge it was deadlocked on two of the charges. At approximately

7:26 p.m., the judge gave the following instructions to the jury,

which defendant argues deprived him of a fair trial:

 I have received a note, which I have marked
 as Court Exhibit [thirteen], which reads as
 follows: "The jury has reached a verdict as
 to one of the counts. The jury is unable to
 reach a verdict as to two of the counts."

 In light of your note, I am going to instruct
 you as follows: Members of the jury, I am going
 to ask that you continue your deliberations
 in an effort to reach an agreement upon the
 verdict and dispose of this case. And I would
 like . . . for you to consider, as you do so,
 the following: This is an important case.
 The trial has been expensive in time, effort,
 money, and emotional strain to both the
 defense and the prosecution. If you should
 fail to agree upon a verdict, the case will
 be left open and may have to be tried again.
 Obviously, another trial would only serve to
 increase the cost of both sides. And there's
 no reason to believe that the case can be tried
 again by either side any better or more
 exhaustively than it has been tried before
 you.

 Any future jury must be selected in the same
 manner and from the same sources you were
 chosen. And there's no reason to believe that
 the case could ever be submitted to [twelve]
 men and women more conscientious, more
 impartial, or more competent to decide it or

 11 A-0347-15T1
that more or clearer evidence could be
produced.

If a substantial majority of your number are
in favor of a conviction[,] those of you who
disagree should reconsider whether your doubt
is a reasonable one[,] since it appears to
make no effective impression upon the minds
of the others. On the other hand, if a
majority or even a lesser number of you are
in favor of acquittal[,] the rest of you
should ask yourselves again and most
thoughtfully whether you should accept the
weight and sufficiency of evidence which fails
to convince your fellow jurors beyond a
reasonable doubt.

Remember at all times that no juror is
expected to give up an honest belief he or she
may have as to the weight or effect of the
evidence. But after full deliberation and
consideration of the evidence in the case[,]
it is your duty to agree upon a verdict if you
can do so.

You must also remember that if the evidence
in the case fails to establish guilt beyond a
reasonable doubt[,] the defendant should have
your unanimous verdict of not guilty. You may
be as leisurely in your deliberations as the
occasion may require and should take all the
time which you feel is necessary. I will ask
you now that you retire once again and
continue your deliberations with these
additional comments in mind to be applied, of
course, in conjunction with all of the other
instructions I have previously given you.

And you have also indicated to the [c]ourt
that you have reached a partial verdict. I
must instruct you that your partial verdicts
will be final and not subject to
reconsideration even if you continue
deliberating on other counts. You have the
option of returning the partial verdicts now;

 12 A-0347-15T1
 which, as I have just instructed to you, will
 be final; or continuing deliberations on all
 the counts.

At approximately 8:13 p.m., the jury returned a guilty verdict on

all charges. Because we do not know on which of the two charges

the jury reached an impasse, we are unable to conclude that the

coercion infected only the weapons charges. In other words, the

entire verdict was infected.

 In Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41

L. Ed. 528 (1896), the United States Supreme Court upheld a charge

in which "the court direct[s] the minority jurors to reconsider

their views in light of their disagreement with the majority."

United States v. E. Med. Billing, Inc., 230 F.3d 600, 602 n.1 (3d

Cir. 2000). In State v. Czachor, 82 N.J. 392, 398-99 (1980), the

New Jersey Supreme Court concluded the Allen charge was inherently

coercive because it urged jurors to reach a verdict, instead of

urging votes based on convictions. The model charge, based on

Czachor provides:

 It is your duty, as jurors, to consult with
 one another and to deliberate with a view to
 reaching an agreement, if you can do so
 without violence to individual judgment. Each
 of you must decide the case for yourself, but
 do so only after an impartial consideration
 of the evidence with your fellow jurors. In
 the course of your deliberations, do not
 hesitate to re-examine your own views and
 change your opinion if convinced it is
 erroneous but do not surrender your honest

 13 A-0347-15T1
 conviction as to the weight or effect of
 evidence solely because of the opinion of your
 fellow jurors, or for the mere purpose of
 returning a verdict. You are not partisans.
 You are judges--judges of the facts.

 [Model Jury Charge (Criminal), "Judge's
 Instructions on Further Jury Deliberations"
 (2013).]

The State concedes the judge erred by not giving the Czachor

charge, but argues the error was harmless.

 "[N]o judge may coerce a jury into rendering a verdict that

does not represent the unfettered and unbiased judgment of each

juror." State v. Barasch, 372 N.J. Super. 355, 361 (App. Div.

2004). "It is of the very essence of the right of trial by jury

that the verdict be free and untrammeled . . . ." In re Stern,

11 N.J. 584, 588 (1953). "Urging a jury to an agreement contrary

to the individual opinion and judgment of one of the jurors on the

merits of the issue may be coercion." Ibid. Judges should not

use "any form of language that has a tendency to 'understate[]'

or 'trivialize the awesome duty of the jury.'" State v. Roberts,

163 N.J. 59, 59 (2000) (alteration in original) (quoting State v.

Biegenwald, 106 N.J. 13, 41 (1987)). Indeed, "[t]rial courts must

understand, as well, that nothing is more important than that they

set the atmosphere of calm, unhurried, and studied deliberation

that is the hallmark of a fair trial." Id. at 60.

 14 A-0347-15T1
 The defendant argues this charge served as the functional

equivalent of an Allen charge, because it stressed judicial economy

and stated minority jurors "'should' reconsider their views in

light of the majority jurors' beliefs." We disagree with the

State's contention that the error was not clearly capable of

producing an unjust result. We emphasize that plain error exists

under the unique circumstances of this case, especially because

of the cumulative failure to qualify the detectives as experts and

give the required expert jury charge.

 Defendant argues his trial counsel rendered ineffective

assistance because he failed to argue his conviction for unlawfully

possessing a handgun violated L. 2013, c. 117, § 1, which states:

 Any person who has in his possession a handgun
 in violation of [N.J.S.A. 2C:39-5(b)] or a
 rifle or shotgun in violation of [N.J.S.A.
 2C:39-5(c)] on the effective date of this act
 may retain possession of that handgun, rifle,
 or shotgun for a period of not more than 180
 days after the effective date of this act.
 During that time period, the possessor of that
 handgun, rifle, or shotgun shall:

 (1) transfer that firearm to any person
 lawfully entitled to own or possess it;
 or

 (2) voluntarily surrender that firearm
 pursuant to the provisions of N.J.S.[A.]
 2C:39-12.

Defendant contends this law created a 180-day amnesty period for

unlawful gun possession.

 15 A-0347-15T1
 "Our courts have expressed a general policy against

entertaining ineffective-assistance-of-counsel claims on direct

appeal because such claims involve allegations and evidence that

lie outside the trial record." State v. Preciose, 129 N.J. 451,

460 (1992). Ordinarily, a "defendant must develop a record at a

hearing at which counsel can explain the reasons for his conduct

and inaction and at which the trial judge can rule upon the claims

including the issue of prejudice." State v. Sparano, 249 N.J.

Super. 411, 419 (App. Div. 1991).

 Nevertheless, and even though we are reversing the weapons

convictions, we conclude defendant's argument is "without

sufficient merit to warrant discussion in a written opinion." R.

2:11-3(e)(2). We add the following brief remarks. The New Jersey

Supreme Court recently stated:

 We find that the amnesty law did not afford
 defendants blanket immunity for the entire
 amnesty period. Reading the law in that way
 would lead to absurd results that the
 Legislature did not intend. It would permit
 violent criminals to carry weapons in public
 with impunity, for almost 180 days, and remain
 free from prosecution so long as they
 transferred or voluntarily surrendered their
 firearms just before the end of the amnesty
 period.

 [State v. Harper, 229 N.J. 228, 232 (2017).]

 16 A-0347-15T1
The amnesty law did not create a 180-day period of blanket

immunity, but protected those who took steps to turn in illegal

firearms. Such is not the case here.

 As to defendant's argument that the judge imposed an excessive

sentence, we are vacating his eight-year prison term because of

the cumulative errors in the jury charge and failure to properly

qualify the detectives as experts. We note, however, that the

judge had denied the State's motion for a discretionary extended

term, and there was nothing in the record suggesting that we should

second-guess the judge's sentencing findings. Nevertheless, as

to his resisting arrest conviction, we conclude that defendant's

sentence is not excessive.

 We reverse and remand for a new trial. We do not retain

jurisdiction.

 17 A-0347-15T1